57.     Thereafter, the mortgage loans supporting the trusts are serviced by the servicer, which earns monthly servicing fees by collecting principal and interest from borrowers. After subtracting a servicing fee, the servicer sends the remainder of the payments to a trustee for administration and distribution to the trust, and ultimately, to investors.

58.     With respect to the Certificates at issue here, the Registration Statements contained material representations and statements concerning, *inter alia*, (i) the underwriting process used for mortgages held by the Issuing Trusts; (ii) the appraised value of the real estate underlying the Issuing Trusts; (iii) the independence of the real estate appraiser used to appraise the real-estate; (iv) the supposed strict adherence to Uniform Standards of Professional Appraisal Practice ("USPAP") standards used in the appraisal process; and (v) the LTV ratios.

59.     The Certificates were sold to Plaintiffs and other Class members pursuant to Prospectuses issued in connection with the Registration Statements and a series of Supplemental Prospectuses filed with the SEC in accordance with Rule 424(b)(5), as identified below:

    a.     August 15, 2005 Registration Statement, filed by IndyMac MBS:

        i.     February 27, 2006 Prospectus

            1)     February 27, 2006 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2006-A1, as supplemented on March 3, 2006;

            2)     February 28, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR2;

            3)     February 28, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR3, as supplemented on March 10, 2006;

            4)     March 28, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR5;

            5)     March 29, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR7;

            6)     March 29, 2006 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2006-A2, as supplemented on April 7, 2006;

            7)     March 29, 2006 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2006-A3CB, as supplemented on March 31, 2006;

            8)     March 30, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006 AR-4;

- 22 -

        9) March 30, 2006 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2006-A4, as supplemented on April 14, 2006;

    ii.  April 25, 2006 Prospectus

        1) May 30, 2006 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2006-R1.

    iii.  October 26, 2006 Prospectus

        1) October 30, 2006 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2006-R2.

  b.  <u>August 17, 2005 Registration Statement, filed by IndyMac ABS:</u>

    i.  August 22, 2005 Prospectus

        1) March 15, 2006 Supplemental Prospectus, filed by IndyMac Residential Mortgage-Backed Trust, Series 2006-L1;

        2) March 30, 2006 Supplemental Prospectus, filed by IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series 2006-H1.

  c.  <u>February 24, 2006 Registration Statement, as amended on March 29, 2006, April 13, 2006, and June 5, 2007, filed by IndyMac MBS:</u>

    i.  April 14, 2006 Prospectus

        1) April 26, 2006 Supplemental Prospectus, filed by Home Equity Mortgage Loan Asset-Backed Trust, Series INDS 2006-1.

    ii.  April 25, 2006 Prospectus

        1) April 25, 2006 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2006-A5CB;

        2) April 27, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR6;

        3) April 27, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR9;

        4) April 27, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR11;

        5) May 26, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR15;

        6) May 30, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR8;

        7) May 30, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR13;

        8) May 30, 2006 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2006-A6, as supplemented on June 9, 2006;

- 23 -

9) May 30, 2006 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2006-A7CB, as supplemented on June 12, 2006;

iii.   June 14, 2006 Prospectus

1) June 15, 2006 Supplemental Prospectus, filed by IndyMac Residential Mortgage-Backed Trust, Series 2006-L2;

2) June 22, 2006 Supplemental Prospectus, filed by IndyMac INDB Mortgage Loan Trust 2006-1;

3) June 26, 2006 Supplemental Prospectus, filed by IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series 2006-H2;

4) June 27, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR21;

5) June 28, 2006 Supplemental Prospectus, filed by IndyMac INDA Mortgage Loan Trust 2006-AR1;

6) June 28, 2006 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2006-A8;

7) June 29, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR19, as supplemented on August 2, 2006;

8) July 25, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR23;

9) July 27, 2006 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2006-A9CB;

10) July 27, 2006 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2006-A10, as supplemented on September 22, 2006;

11) July 27, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR12;

12) July 27, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR25;

13) July 28, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-R1;

14) August 29, 2006 Supplemental Prospectus, filed by IndyMac INDA Mortgage Loan Trust 2006-AR2;

15) August 29, 2006 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2006-A11;

16) August 29, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR27, as supplemented on October 25, 2006;

17) September 14, 2006 Supplemental Prospectus, filed by Home Equity Mortgage Loan Asset-Backed Trust, Series INDS 2006-2B;

- 24 -

18) September 21, 2006 Supplemental Prospectus, filed by IndyMac Residential Mortgage-Backed Trust, Series 2006-L3;

19) September 27, 2006 Supplemental Prospectus, filed by IndyMac Home Equity Mortgage Asset-Backed Trust, Series 2006-H3;

20) September 27, 2006 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2006-A12;

21) September 27, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-FLX1, as supplemented on January 12, 2007;

22) September 28, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR29;

23) October 16, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR31.

iv.   October 26, 2006 Prospectus

1)   October 26, 2006 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2006-A13;

2)   October 30, 2006 Supplemental Prospectus, filed by IndyMac INDA Mortgage Loan Trust 2006-AR3, as supplemented on March 24, 2008;

3)   October 30, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR14;

4)   November 2, 2006 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2006-A14CB, as supplemented on February 20, 2007;

5)   November 28, 2006 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2006-A15;

6)   November 28, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR33;

7)   November 29, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR35;

8)   December 27, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR37;

9)   December 27, 2006 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2006-A16, as supplemented on January 10, 2007;

10) December 28, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR39, as supplemented on January 16, 2007;

11) December 28, 2006 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2006-AR41.

- 25 -

v.   January 29, 2007 Prospectus

1)  January 29, 2007 Supplemental Prospectus, filed by IndyMac INDA Mortgage Loan Trust 2007-AR1;

2)  January 30, 2007 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2007-FLX1;

3)  January 30, 2007 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2007-A1.

vi.   February 27, 2007 Prospectus

1)  February 27, 2007 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2007-AR1;

2)  February 27, 2007 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2007-FLX2, as supplemented on June 13, 2007;

3)  February 27, 2007 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2007-A2;

4)  February 27, 2007 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2007-A3.

vii.   March 29, 2007 Prospectus

1)  March 29, 2007 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2007-AR5;

2)  March 29, 2007 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2007-A5, as supplemented on September 11, 2007;

3)  April 26, 2007 Supplemental Prospectus, filed by IndyMac INDA Mortgage Loan Trust 2007-AR2;

4)  April 26, 2007 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2007-AR7;

5)  April 26, 2007 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2007-AR9;

6)  April 26, 2007 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2007-AR11;

7)  April 27, 2007 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2007-A6;

8)  April 27, 2007 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2007-FLX3;

9)  May 29, 2007 Supplemental Prospectus, filed by IndyMac IMSC Mortgage Loan Trust 2007-F1, as supplemented on June 1, 2007 and June 11, 2007;

10) May 30, 2007 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2007-FLX4;

- 26 -

        11) May 30, 2007 Supplemental Prospectus, filed by IndyMac INDA Mortgage Loan Trust 2007-AR3;

        12) May 30, 2007 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2007-AR13;

        13) May 30, 2007 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2007-A7.

   viii.   July 26, 2007 Prospectus

        1) August 16, 2007 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2007-R1.

  d.  <u>June 2, 2006 Registration Statement, as amended on August 23, 2006 and October 10, 2006, filed by IndyMac ABS:</u>

   i.   December 11, 2006 Prospectus

        1) December 14, 2006 Supplemental Prospectus, filed by IndyMac Residential Mortgage-Backed Trust, Series 2006-L4;

        2) December 20, 2006 Supplemental Prospectus, filed by IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series 2006-H4;

        3) March 21, 2007 Supplemental Prospectus, filed by IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series 2007-H1;

        4) March 26, 2007 Supplemental Prospectus, filed by IndyMac Residential Mortgage-Backed Trust, Series 2007-L1.

  e.  <u>February 14, 2007 Registration Statement, as amended on March 1, 2007, June 6, 2007, and June 19, 2007, filed by IndyMac MBS:</u>

   i.   June 27, 2007 Prospectus

        1) June 27, 2007 Supplemental Prospectus, filed by IndyMac INDA Mortgage Loan Trust 2007-AR4;

        2) June 27, 2007 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2007-AR15;

        3) June 27, 2007 Supplemental Prospectus, filed by IndyMac Mortgage Loan Trust 2007-AR17;

        4) June 27, 2007 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2007-FLX5;

        5) June 28, 2007 Supplemental Prospectus, filed by IndyMac IMJA Mortgage Loan Trust 2007-A1, as supplemented on July 19, 2007;

        6) June 28, 2007 Supplemental Prospectus, filed by IndyMac IMSC Mortgage Loan Trust 2007-AR1;

        7) June 28, 2007 Supplemental Prospectus, filed by IndyMac IMSC Mortgage Loan Trust 2007-F2;

- 27 -

8) June 29, 2007 Supplemental Prospectus, filed by IndyMac IMSC Mortgage Loan Trust 2007-HOA1, as supplemented on July 16, 2007;

9) June 29, 2007 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2007-A8.

ii.   July 26, 2007 Prospectus

1) July 26, 2007 Supplemental Prospectus, filed by Residential Asset Securitization Trust 2007-A9;

2) July 27, 2007 Supplemental Prospectus, filed by IndyMac INDA Mortgage Loan Trust 2007-AR5;

3) July 30, 2007 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2007-AR19;

4) July 30, 2007 Supplemental Prospectus, filed by IndyMac IMSC Mortgage Loan Trust 2007-AR2;

5) July 30, 2007 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2007-FLX6.

iii.   August 29, 2007 Prospectus

1) August 29, 2007 Supplemental Prospectus, filed by IndyMac INDA Mortgage Loan Trust 2007-AR6;

2) August 30, 2007 Supplemental Prospectus, filed by IndyMac IMJA Mortgage Loan Trust 2007-A2;

3) August 30, 2007 Supplemental Prospectus, filed by IndyMac IMSC Mortgage Loan Trust 2007-F3;

4) September 25, 2007 Supplemental Prospectus, filed by IndyMac IMJA Mortgage Loan Trust 2007-A3;

5) September 27, 2007 Supplemental Prospectus, filed by IndyMac INDA Mortgage Loan Trust 2007-AR7.

iv.   November 5, 2007 Prospectus

1) November 5, 2007 Supplemental Prospectus, filed by IndyMac INDX Mortgage Loan Trust 2007-AR21IP;

2) November 29, 2007 Supplemental Prospectus, filed by IndyMac INDA Mortgage Loan Trust 2007-AR8, as supplemented on December 27, 2007;

3) December 21, 2007 Supplemental Prospectus, filed by IndyMac INDA Mortgage Loan Trust 2007-AR9, as supplemented on December 27, 2007;

4) January 25, 2008 Supplemental Prospectus, filed by IndyMac IMJA Mortgage Loan Trust 2007-A4.

- 28 -

154

60.     Each Supplemental Prospectus filed with the SEC in connection with the Registration Statements contained substantially similar material representations and statements concerning, *inter alia*, (i) the underwriting process used for mortgages held by the Issuing Trusts; (ii) the appraised value of the real-estate underlying the Issuing Trusts; (iii) the independence of the real estate appraiser used to appraise the real estate; (iv) the supposed strict adherence to USPAP standards used in the appraisal process; and (v) the LTV ratios.

**2.     Importance of Objective, Unbiased, and Accurate Property Appraisals**

61.     Independent and accurate real estate appraisals are essential to the entire mortgage lending and securitization process, providing borrowers, lenders, and investors in MBS with supposedly independent and accurate assessments of the value of the mortgaged properties. Accurate appraisals ensure that a mortgage or home equity loan is not under-collateralized, thereby protecting borrowers from financially over-extending themselves and protecting lenders and investors in MBS in the event a borrower defaults on a loan. Accurate appraisals also provide investors with a basis for assessing the price and risk of MBS.

62.     An accurate appraisal is also critical in the determining the LTV ratio, which is a financial metric that Wall Street analysts and investors commonly use when evaluating the price and risk of MBS. The LTV ratio is a mathematical calculation that expresses the amount of a mortgage as a percentage of the total appraised value of the property. For example, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000, or 90 percent. If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75 percent ($90,000/$120,000).

63.     From a lender's perspective, a high LTV ratio is riskier because a borrower with a small equity position in a property has less to lose if he or she defaults on the loan. Worse, particularly in an era of falling housing prices, a high LTV ratio creates the heightened risk that, should the borrower default, the amount of the outstanding loan may exceed the value of the property.

64.     For purchasers of the Certificates, an important representation in the Registration Statements, Prospectuses and Supplemental Prospectuses was that the mortgages underlying the

- 29 -

1  Issuing Trusts were issued pursuant to strict underwriting standards, and that the real estate

2  collateralizing the mortgages had been subjected to appraisals performed by independent,

3  objective, and unbiased appraisers, pursuant to the stringent standards of the USPAP.

4      65.     Specifically, the USPAP requires, *inter alia,* that:

5      An appraiser must perform assignments with impartiality, objectivity, and
       independence, and without accommodation of personal interests;

6      In appraisal practice, an appraiser must not perform as an advocate for any party
7      or issue;

8      An appraiser must not accept an assignment that includes the reporting of
       predetermined opinions and conclusions; and

9      It is unethical for an appraiser to accept an assignment, or to have a compensation
10     arrangement for an assignment, that is contingent on any of the following: 1. the
       reporting of a predetermined result (e.g., opinion of value); 2. a direction in
11     assignment results that favors the cause of the client; 3. the amount of a value
       opinion; 4. the attainment of a stipulated result; or 5. the occurrence of a
12     subsequent event directly related to the appraiser's opinions and specific to the
       assignment's purpose.

13     66.     Indeed, the February 24, 2006 and June 2, 2006 Registration Statements assured

14 that:

15     To determine the adequacy of the property to be used as collateral, an appraisal is
16     generally made of the subject property *in accordance with the Uniform
       Standards of Professional Appraisal Practice.* The appraiser generally inspects
17     the property, analyzes data including the sales prices of comparable properties and
       issues an opinion of value using a Fannie Mae/Freddie Mac appraisal report form,
18     or other acceptable form. In some cases, an automated valuation model (AVM)
       may be used in lieu of an appraisal. AVMs are computer programs that use real
19     estate information, such as demographics, property characteristics, sales prices,
       and price trends to calculate a value for the specific property. The value of the
20     property, as indicated by the appraisal or AVM, must support the loan amount.

21 (Emphasis added).

22     67.     The Supplemental Prospectuses further stated that:

23     To determine the adequacy of the property to be used as collateral, an appraisal is
       generally made of the subject property *in accordance with the Uniform Standards
24     of Professional Appraisal Practice.* The appraiser generally inspects the property,
       analyzes data including the sales prices of comparable properties and issues an
25     opinion of value using a Fannie Mae/Freddie Mac appraisal report form, or other
       acceptable form. In some cases, an automated valuation model (AVM) may be used
26     in lieu of an appraisal. AVM's are computer programs that use real estate
       information, such as demographics, property characteristics, sales prices, and price
27     trends to calculate a value for the specific property. The value of the property, as
       indicated by the appraisal or AVM, must support the loan amount.

28

- 30 -

1    (Emphasis added)

2        68.    By securitizing the mortgages and selling them to Plaintiffs and members of the

3    Class, Defendants reduced the exposure of the Corporate Defendants and IndyMac reduced its

4    exposure to the risk of a borrower's default.

5        69.    Because IndyMac's profits were determined largely by the *quantity* of the loans

6    successfully closed and not on the *quality* of those loans, IndyMac pressured appraisers to reach

7    artificial appraised values to allow more loans to close, and to apparently satisfy the LTV

8    thresholds for sale to the securitization market.

9    **B.    The Truth is Revealed**

10       **The June 30, 2008 CRL Report**

11       70.    On June 30, 2008, the Center for Responsible Lending issued a report titled,

12   *IndyMac: What Went Wrong? How an "Alt-A" Leader Fueled Its Growth with Unsound and*

13   *Abusive Mortgage Lending,* which concluded that the IndyMac defendants "pushed through

14   loans based on bogus appraisals and income data that exaggerated borrowers' finances."

15       71.    According to the CRL report, 19 former IndyMac employees, the majority of

16   whom were former IndyMac mortgage underwriters responsible for reviewing loan applications,

17   stated that IndyMac "pushed through loans with fudged or falsified information or simply

18   lowered standards so dramatically that shaky loans were easy to approve."

19       72.    The former employees described an environment where they were pressured to

20   push loans through by upper management regardless of whether they satisfied IndyMac's

21   underwriting guidelines.

22       73.    According to the CRL report, eight former employees identified as confidential

23   witnesses in the lawsuit *Tripp v. IndyMac* (C.D. Cal.), No. 07-CV-1635-GW (VBK), described

24   internal pressures to approve dicey loans.  For example, a former IndyMac vice president stated

25   that IndyMac Bancorp CEO, Michael Perry, and other top managers focused on increasing loan

26   volume "at all costs," putting pressure on subordinates to disregard company policies and simply

27   "push loans through."  Another former employee claimed that IndyMac was about "production

28   and nothing else."

-31-

74.     Former underwriter and underwriting team leader at IndyMac's Marlton, New Jersey location, Audrey Streater, said during an interview with CRL, "I would reject a loan and the insanity would begin." "It would go to upper management and the next thing you know it's going to closing . . . . I'm like, 'What the Sam Hill? There's nothing in there to support this loan.'" She stated that upper management at the company's Pasadena headquarters "probably got more involved than they should be."

75.     Similarly, Scott Montilla, who worked as an underwriter for IndyMac in Arizona, told CRL that higher-ups overruled his decisions roughly half the time. He also said, "There were some loans that were just blatantly overstated. . . . Some of these loans are very questionable. They're not going to perform." Nevertheless, in some instances, he says, he was forced to approve the loans, which later went into default.

76.     During CRL's interview with Wesley E. Miller, a former underwriter in California from 2005 through 2007, Miller stated that when he rejected a loan, sales managers screamed at him and then went up the line to a senior vice president and got it okayed. He said, "There's a lot of pressure when you're doing a deal and you know it's wrong from the get-go – that the guy can't afford it. . . . And then they pressure you to approve it." The refrain from managers, he recalls, was simple, "Find a way to make this work."

77.     According to CRL, Streater indicated that many underwriters were worn down by the pressure to book loans and were stymied and afraid to make decisions because "somebody is going to yell at you." She says that some "were making decisions based on: 'I might as well do this because it's going to get approved anyway.'"

78.     Streater claimed that, in recent years, underwriting had become a procedural annoyance that was tolerated because loans needed an underwriter's stamp of approval if they were going to be sold to investors.

79.     Pursuant to the CRL report, eleven former employees stated during interviews that IndyMac routinely funded loans without regard for borrowers' ability to repay.

80.     Streater and other former employees stated that IndyMac's "stated income" program, which did not require documentation of the borrower's wages, allowed mortgage

-32-

1   brokers and in-house sales staffers to inflate applicants' incomes and make them look like better

2   credit risks.

3       81.     Even mortgages that IndyMac issued purportedly under its "full documentation"

4   program were based on insufficient or falsified documents.  As reported by CRL, these

5   mortgages were supported by a verification of employment form, which confirms a prospective

6   borrower's employment, but does not authenticate his or her income.  Indeed, a February 2006

7   internal document says in bold letters, "**IndyMac NonPrime will accept a Verification of**

8   **Employment for a full documentation loan with no pay stubs or W2s needed!**"

9       82.     A former IndyMac fraud investigator, also identified as a confidential witness in

10  *Tripp v. IndyMac*, indicated that shoddily documented loans within IndyMac were commonly

11  referred to as "Disneyland loans," in honor of a mortgage IndyMac had issued to a Disneyland

12  cashier whose loan application claimed an annual income of $90,000.

13      83.     The CRL report also described IndyMac's practice of inflating appraisals of the

14  underlying property used as collateral for the mortgage loans.  CRL stated that according to

15  allegations in the lawsuit *Cedeno v. IndyMac* (S.D.N.Y.), No. 06-CV-06438, IndyMac provided

16  outside appraisers with a "target value" that was necessary to make the loan go through.

17  Appraisers who were able to hit the "target values" were rewarded with more assignments, and

18  appraisers who did not had their assignments cut.

19      84.     According to the CRL Report, one confidential witness identified in *Cedeno v.*

20  *IndyMac*, stated that in-house employees who were supposed to make sure property values were

21  accurate were intimidated by higher-ups and told they would be fired if they tried to block

22  fraudulent appraisals.

23  **IndyMac Bank Is Seized By Regulators**

24      85.     On July 11, 2008, IndyMac became the third-largest bank failure in U.S. history

25  when U.S. banking regulators seized IndyMac Bancorp and announced that the FDIC would seek

26  a buyer for IndyMac. The FDIC estimated the cost to its insurance fund as a result of the

27  IndyMac takeover at between $4 billion and $8 billion.

28

- 33 -

**The FBI Investigates IndyMac for Fraud**

86.     On July 16, 2008, CNN announced that according to a source, the FBI was investigating IndyMac for fraud.  CNN reported:

> A source said the federal government is looking into whether the bank engaged in fraud when it made home loans to high-risk borrowers.

> The source said the investigation is focused primarily on the company, not individuals.

> Meanwhile Josh Hochberg, the former head of the U.S. Justice Department's fraud section, said that any investigation of Indymac would probably look into whether the bank used false information to give loans to people who wouldn't have otherwise been eligible.

> "I would suspect they are looking at bad appraisals, bad underwriting, which would mean false statements on loan applications, some of which require federal forms to be filled out – so they can be prosecuted for the false statements," he said.  "I would also suspect they would look at false statements to the investing community for securities fraud violations."

**Negative Action Taken by Various Rating Agencies**

87.     Following the CRL report and announcement of the FBI investigation, disclosures about the credit quality of the assets supporting the Certificates issued pursuant to the Supplemental Prospectuses began to emerge.  Substantial negative action was taken by various Rating Agencies with respect to the Certificates.

88.     For example, on September 15, 2008, S&P downgraded three classes of IndyMac IMJA Mortgage Loan Trust 2007-A1 Certificates from investment grade to junk status, and downgraded six classes of Certificates from AAA to BBB.

89.     On October 20, 2008, S&P downgraded five IndyMac IMSC Mortgage Loan Trust 2007-HOA1 Certificates from investment grade to junk status and placed three classes of Certificates originally rated AAA on a negative watch.

90.     On October 27, 2008, S&P downgraded seven classes of IndyMac IMSC Mortgage Loan Trust 2007-F1 Certificates from investment grade to junk status and two classes of Certificates from AAA to BBB-.  Likewise, on December 16, 2008, Fitch downgraded five classes of the Certificates from AAA to junk status and placed one class originally rated AAA on a negative watch.

- 34 -

91.   S&P also downgraded on October 27, 2008 seven classes of IndyMac IMSC Mortgage Loan Trust 2007-AR2 Certificates from investment grade to junk status.

92.   On October 30, 2008, S&P downgraded eight classes of IndyMac IMSC Mortgage Loan Trust 2007-AR1 Certificates from investment grade to junk status. S&P also downgraded eight classes of IndyMac IMSC Mortgage Loan Trust 2007-F2 Certificates from investment grade to junk status and three classes of Certificates from AAA to BBB-.

93.   On November 5, 2008, S&P downgraded seven classes of IndyMac IMSC Mortgage Loan Trust 2007-F3 Certificates from investment grade to junk status and four classes of Certificates from AAA to A or BBB.  Similarly, on December 16, 2008, Fitch downgraded seven classes of Certificates from investment grade to junk status and placed one class of Certificates originally rated AAA on a negative watch.

94.   On November 11, 2008, S&P downgraded six classes of Home Equity Mortgage Loan Asset-Backed Trust, Series INDS 2006-1 Certificates from investment grade to junk status and nine classes of Certificates from AAA to A, BBB, or BBB-.

95.   On November 19, 2008, S&P downgraded IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series 2006-H3 Class A Certificates from AAA to junk status.

96.   On November 24, 2008, S&P downgraded IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series 2006-H2 Class A Certificates from AAA to A.

97.   On December 4, 2008, S&P downgraded IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series 2006-H1 and Series INDS 2006-2B Class A Certificates from AAA to junk status.

98.   The rating agencies similarly took negative action with respect to the majority of the other Issuing Trusts' Certificates.

99.   As a result of these rating actions, the Certificates are no longer marketable at the price paid by plaintiff and the Class, and the Certificates present a higher risk with respect to both the timing and absolute cash flow to be received than the Registration Statement had represented.

- 35 -

## FALSE AND MISLEADING STATEMENTS

100.    Each of the Registration Statements, Prospectuses and Supplemental Prospectuses for the Issuing Trusts contained substantially similar untrue statements of material fact and omitted to state facts necessary to make the statements therein not misleading regarding: (1) the purportedly rigorous underwriting each loan – either first mortgage, or HELOC – underwent regarding before it was included in the pool regarding the borrower's employment, credit quality, and financial condition, (2) the appraisal of the mortgaged property to be used as the underlying collateral, and (3) the LTV Ratio of the mortgage loans underlying the Certificates.

### 1.    The Mortgage Loans

101.    Each of the Registration Statements contained: (i) an illustrative form of base prospectus, (ii) an illustrative form of prospectus supplement for use in any offering of Certificates, (iii) an illustrative form of prospectus supplement for use in an offering of Mortgage Pass-Through Certificates with a specified structure of multiple classes of senior and subordinate Certificates, and (iv) an illustrative form of prospectus supplement for use in an offering of Mortgage-Backed Notes.

102.    According to the Registration Statements, the mortgage loans in the pool held by each Issuing Trust were underwritten in accordance with both IndyMac Bank's underwriting guidelines and with established industry guidelines.  For example, the February 24, 2006 Registration Statement filed by IndyMac MBS stated:

> Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac Bank according to IndyMac Bank's underwriting guidelines, which also accept mortgage loans meeting Fannie Mae or Freddie Mac guidelines regardless of whether such mortgage loans would otherwise meet IndyMac Bank's guidelines, or pursuant to an exception to those guidelines based on IndyMac Bank's procedures for approving such exceptions.[3]

103.    The Supplemental Prospectuses contained additional specific information describing the underwriting to which each first mortgage supporting the Certificates was subject.

---

[3]    IndyMac ABS's Registration Statement No. 333-134691, dated June 2, 2006, at S-40 and 47, and nearly all of IndyMac ABS and IndyMac MBS Supplemental Prospectuses for the mortgage loans used the same, or substantially similar, language.

-36-

For example, the Supplemental Prospectuses describe IndyMac's e-MITS underwriting system

that purportedly provides more objective and consistent underwriting than traditional methods:[4]

> IndyMac Bank has two principal underwriting methods designed to be responsive
> to the needs of its mortgage loan customers: traditional underwriting and e-MITS
> (Electronic Mortgage Information and Transaction System) underwriting. E-
> MITS is an automated, internet-based underwriting and risk-based pricing system.
> IndyMac Bank believes that e-MITS generally enables it to estimate expected
> credit loss, interest rate risk and prepayment risk more objectively than traditional
> underwriting and also provides consistent underwriting decisions. IndyMac Bank
> has procedures to override an e-MITS decision to allow for compensating factors.

104.    The above statements were untrue statements of material fact and failed to

disclose that IndyMac Bank was not following, and in many cases was blatantly disregarding its

stated underwriting guidelines with respect to: (1) the procurement and verification of

information and documentation, including the borrower's employment, credit quality, and

financial condition, in evaluating a prospective borrower's ability to meet the monthly

obligations on the proposed loan, (2) the appraisal of the mortgaged property to be used as the

underlying collateral, and (3) the LTV Ratio of the mortgage loans underlying the Certificates.

105.    The Registration Statements also stated that IndyMac Bank's underwriting

process evaluated the prospective borrower's ability to meet the monthly obligations on the

proposed mortgage loan and specifically described the criteria and documentation considered in

the evaluation. The Registration Statements and base Prospectuses each stated:

> Underwriting standards are applied by or on behalf of a lender to evaluate the
> borrower's credit standing and repayment ability, and the value and adequacy of
> the Property as collateral. [Most lenders offer a number of different underwriting
> programs. Some programs place more emphasis on a borrower's credit standing
> and repayment ability while others emphasize the value and adequacy of the
> Property as collateral. The most comprehensive of the programs emphasize
> both.][5]

> In general, where a loan is subject to full underwriting review, a prospective
> borrower applying for a mortgage loan is required to fill out a detailed application
> designed to provide to the underwriting officer pertinent credit information. As
> part of the description of the borrower's financial condition, the borrower
> generally is required to provide a current list of assets and liabilities and a
> statement of income and expenses, as well as an authorization to apply for a credit
> report which summarizes the borrower's credit history with local merchants and
> lenders and any record of bankruptcy. In most cases, an employment verification
> is obtained from an independent source, typically the borrower's employer. The

---

[4]    The quoted language is from the Supplemental Prospectus for the Residential Asset Securitization Trust 2006-A1. Each of the Supplemental Prospectuses contains substantially similar language.
[5]    Bracketed language was omitted from the August 17, 2005 IndyMac ABS Registration Statement.

- 37 -

verification reports the length of employment with that organization, the borrower's current salary and whether it is expected that the borrower will continue employment in the future. If a prospective borrower is self-employed, the borrower may be required to submit copies of signed tax returns. The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts.

\* \* \*

[Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance). The underwriting standards applied by sellers, particularly with respect to the level of loan documentation and the mortgagor's income and credit history, may be varied in appropriate cases where factors as low Loan-to-Value Ratios or other favorable credit factors exist.][6]

106.    The IndyMac MBS Registration Statement, dated August 15, 2005, additionally stated:

IndyMac's underwriting standards for conventionally underwritten mortgage loans are based on traditional underwriting factors, including the creditworthiness of the mortgagor, the capacity of the mortgagor to repay the mortgage loan according to its terms, and the value of the related mortgaged property. Among other factors, IndyMac Bank will consider such factors as loan-to-value-ratios, debt-to-income ratio, FICO Credit Score, loan amount, and the extent to which IndyMac Bank can verify the mortgagor's application and supporting documentation. These standards are applied in accordance with applicable federal and state laws and regulations. Exceptions to these underwriting standards are permitted where compensating factors are present or in the context of negotiated bulk purchases.

107.    The IndyMac MBS Registration Statement, dated February 24, 2006, and the IndyMac ABS Registration Statement, dated June 2, 2006, additionally stated:

IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral. Traditional underwriting decisions are made by individuals authorized to consider compensating factors that would allow mortgage loans not otherwise meeting IndyMac Bank's guidelines.

In determining a borrower's FICO Credit Score, IndyMac Bank generally selects the middle credit score of the scores provided by each of the three major U.S. credit repositories (Equifax, TransUnion and Experian) for each borrower, and then selects the lowest of these scores. In some instances, IndyMac Bank selects the middle score of the borrower with the largest amount of qualifying income among all of the borrowers on the mortgage loan. A FICO Credit Score might not

---

[6]    Bracketed language was omitted from the August 17, 2005 IndyMac ABS Registration Statement.

- 38 -

be available for a borrower due to insufficient credit information on file with the credit repositories. In these situations, IndyMac Bank will establish a borrower's credit history through documentation of alternative sources of credit such as utility payments, auto insurance payments and rent payments. In addition to the FICO Credit Score, other information regarding a borrower's credit quality is considered in the loan approval process, such as the number and degree of any late mortgage or rent payments within the preceding 12-month period, the age of any foreclosure action against any property owned by the borrower, the age of any bankruptcy action, the number of seasoned tradelines reflected on the credit report and any outstanding judgments, liens, charge-offs or collections.[7]

108.   IndyMac further represented that the mortgage loans purchased by IndyMac Bank were originated under one of several documentation programs. The February 24, 2006 Registration Statement stated:

IndyMac Bank purchases loans that have been originated under one of seven documentation programs: Full/Alternate, FastForward, Limited, Stated Income, No Ratio, No Income/No Asset and No Doc. In general, documentation types that provide for less than full documentation of employment, income and liquid assets require higher credit quality and have lower loan-to-value ratios and loan amount limits.

Under the Full/Alternate Documentation Program, the prospective borrower's employment, income and assets are verified through written documentation such as tax returns, pay stubs or W-2 forms. Generally, a two-year history of employment or continuous source of income is required to demonstrate adequacy and continuance of income. Borrowers applying under the Full/Altern ate Documentation Program may, based on certain loan characteristics and higher credit quality, qualify for IndyMac Bank's FastForward program and be entitled to income and asset documentation relief.   Borrowers who qualify for FastForward must state their income, provide a signed Internal Revenue Service Form 4506 (authorizing IndyMac Bank to obtain copies of their tax returns), and state their assets; IndyMac Bank does not require any verification of income or assets under this program.

The Limited Documentation Program is similar to the Full/Alternate Documentation Program except that borrowers generally must document income and employment for one year (rather than two, as required by the Full/Alternate Documentation Program). Borrowers under the Limited Documentation Program may use bank statements to verify their income and employment. If applicable, written verification of a borrower's assets is required under this program.

The Stated Income Documentation Program requires prospective borrowers to provide information regarding their assets and income. Information regarding a borrower's assets, if applicable, is verified through written communications. Information regarding income is not verified and employment verification may not be written.

The No Ratio Program requires prospective borrowers to provide information regarding their assets, which is then verified through written communications.

---

[7]   Nearly all of IndyMac ABS and IndyMac MBS Supplemental Prospectuses for the mortgage loans used the same, or substantially similar, language.

The No Ratio Program does not require prospective borrowers to provide information regarding their income, but employment may not be written.

Under the No Income/No Asset Documentation Program and the No Doc Documentation Program, emphasis is placed on the credit score of the prospective borrower and on the value and adequacy of the mortgaged property as collateral, rather than on the income and the assets of the prospective borrower. Prospective borrowers are not required to provide information regarding their assets or income under either program, although under the No Income/No Asset Documentation Program, employment is orally verified.[8]

109.    These representations were untrue statements of material fact and failed to state that IndyMac Bank had become so extremely aggressive in making loans that many of the loans were made to borrowers who had not submitted the required documentation or were made to borrowers based on misrepresented documentation.

110.    The Registration Statements also contained untrue statements of material fact with respect to the underwriting guidelines used to determine the value of the underlying collateral for mortgage loans included in the Issuing Trusts. For example, the IndyMac MBS Registration Statement, dated February 24, 2006, contained the following statement:

To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession Appraisal Practice. The appraiser generally inspects the property, analyzes data including the sales prices of comparable properties and issues an opinion of value using a Fannie Mae/Freddie Mac appraisal report form, or other acceptable form. In some cases, an automated valuation model (AVM) may be used in lieu of an appraisal. AVMs are computer programs that use real estate information, such as demographics, property characteristics, sales prices, and price trends to calculate a value for the specific property. The value of the property, as indicated by the appraisal or AVM, must support the loan amount.[9]

111.    The IndyMac MBS Registration Statement, dated February 24, 2006, further stated:

In determining the adequacy of the Property as collateral, an appraisal is made of each property considered for financing. Except as described in the applicable prospectus supplement, an appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed. The appraisal is based on the market value of comparable homes, the estimated rental

---

[8]    Each Registration Statement used the same or substantially similar language. *See e.g.* IndyMac MBS Reg. Stat. No. 333-127556, dated August 15, 2005, at S-24; IndyMac ABS Reg. Stat. No. 333-134691, dated June 2, 2006, at S-41-S-42 and 48-49. Additionally, each IndyMac ABS and IndyMac MBS Supplemental Prospectus for the mortgage loans repeated the same, or substantially similar, language.

[9]    The IndyMac ABS Registration Statement, dated June 2, 2006, at S-42 and 49, and nearly all of the IndyMac ABS and IndyMac MBS Supplemental Prospectuses for the mortgage loans used the same, or substantially similar, language.

- 40 -

income (if considered applicable by the appraiser) and the cost of replacing the home.[10]

112.   The above statements were untrue statements of material fact and failed to disclose Defendants' ongoing practice of systematically inflating appraisals for properties which failed to satisfy its threshold for adequate LTV ratios for mortgages and HELOCs included in the Issuing Trusts.

113.   As defined by the IndyMac ABS and IndyMac MBS Supplemental Prospectuses, "[t]he 'LOAN-TO-VALUE RATIO' of a Mortgage Loan at any given time is a fraction, expressed as a percentage, the numerator of which is the principal balance of that Mortgage Loan at the date of determination and the denominator of which is (a) in the case of a purchase, the lesser of the selling price of the mortgaged property or its appraised value at the time of sale, or (b) in the case of a refinance, the appraised value of the mortgaged property at the time of the refinance."

114.   Each Supplemental Prospectus disclosed the weighted average original LTV Ratio of the mortgage loans as of the cut-off date within the Issuing Trusts, as set forth in the following chart:

| Issuing Trust | Loan Group 1 | Loan Group 2 | Loan Group 3 | Loan Group 4 | Loan Group 5 | Loan Group 6 | Aggregate | Aggregate Loan Group I | Aggregate Loan Group II |
|---|---|---|---|---|---|---|---|---|---|
| IndyMac INDX Mortgage Loan Trust 2006-AR3 | 76.84% | 75.91% | 74.00% | | | | 75.50% | | |
| IndyMac INDX Mortgage Loan Trust 2006-AR4 | 72.81% | | | | | | | | |
| IndyMac INDX Mortgage Loan Trust 2006-AR5 | 70.58% | 70.52% | | | | | 70.54% | | |

[10]  Each Registration Statement used the same or substantially similar language. *See e.g.* IndyMac MBS Reg. Stat. No. 333-127556, dated August 15, 2005, at 25; IndyMac ABS Reg. Stat. No. 333-127617, dated August 17, 2005; IndyMac ABS Reg. Stat. No. 333-134691, dated June 2, 2006; IndyMac MBS Reg. Stat. No. 333-140726, dated February 14, 2007, at 36.  Additionally, each Base Prospectus repeated the same, or substantially similar, language.

- 41 -

| Issuing Trust | Loan Group 1 | Loan Group 2 | Loan Group 3 | Loan Group 4 | Loan Group 5 | Loan Group 6 | Aggregate | Aggregate Loan Group I | Aggregate Loan Group II |
|---|---|---|---|---|---|---|---|---|---|
| IndyMac INDX Mortgage Loan Trust 2006-AR7 | 76.98% | 76.68% | 74.76% | 77.26% | 74.59% | | 76.12% | | |
| Residential Asset Securitization Trust 2006-A1 | 71.10% | 64.82% | 69.30% | | | | | (group 1) | undisclosed (groups 2 and 3) |
| Residential Asset Securitization Trust 2006-A2 | 70.46% | | | | | | | | |
| Residential Asset Securitization Trust 2006-A3CB | 72.56% | | | | | | | | |
| Residential Asset Securitization Trust 2006-A4 | 76.60% | 71.35% | | | | | 74.91% | | |
| Residential Asset Securitization Trust 2006-R1 | 72.56% | | | | | | | | |
| Residential Asset Securitization Trust 2006-R2 | 71.10% | 64.82% | 69.30% | | | | | 70.93% (group 1) | undisclosed (groups 2 and 3) |
| IndyMac Residential Mortgage-Backed Trust, Series 2006-L1 | 83.52% | | | | | | | | |
| Home Equity Mortgage Loan Asset-Backed Trust, Series INDS 2006-1 | 95.16% | | | | | | | | |

- 42 -

| Issuing Trust | Loan Group 1 | Loan Group 2 | Loan Group 3 | Loan Group 4 | Loan Group 5 | Loan Group 6 | Aggregate | Aggregate Loan Group I | Aggregate Loan Group II |
|---|---|---|---|---|---|---|---|---|---|
| IndyMac INDX Mortgage Loan Trust 2006-AR11 | 73.80% | 71.18% | 78.92% | 75.30% | 79.12% | 72.92% | 75.76% | | |
| IndyMac INDX Mortgage Loan Trust 2006-AR13 | 68.62% | | | | | | | | |
| IndyMac INDX Mortgage Loan Trust 2006-AR15 | 75.97% | | | | | | | | |
| IndyMac INDX Mortgage Loan Trust 2006-AR6 | 70.44% | 75.10% | | | | | 72.91% | | |
| IndyMac INDX Mortgage Loan Trust 2006-AR8 | 74.11% | | | | | | | | |
| IndyMac INDX Mortgage Loan Trust 2006-AR9 | 69.16% | 70.56% | 70.45% | 73.55% | | | 70.41% | | |
| Residential Asset Securitization Trust 2006-A5CB | 73.85% | | | | | | | | |
| Residential Asset Securitization Trust 2006-A6 | 74.42% | 72.59% | | | | | 73.68% | | |
| Residential Asset Securitization Trust 2006-A7CB | 70.82% | 77.21% | 76.21% | | | | 74.28% | | |
| IndyMac INDA Mortgage Loan Trust 2006-AR1 | 66.72% | | | | | | | | |

- 43 -

| Issuing Trust | Loan Group 1 | Loan Group 2 | Loan Group 3 | Loan Group 4 | Loan Group 5 | Loan Group 6 | Aggregate | Aggregate Loan Group I | Aggregate Loan Group II |
|---|---|---|---|---|---|---|---|---|---|
| IndyMac INDA Mortgage Loan Trust 2006-AR2 | 71.30% | 68.56% | 69.87% | 69.79% | | | 69.67% | | |
| IndyMac INDB Mortgage Loan Trust 2006-1 | 79.84% | | | | | | | | |
| IndyMac INDX Mortgage Loan Trust 2006-AR12 | 72.84% | | | | | | | | |
| IndyMac INDX Mortgage Loan Trust 2006-AR19 | 76.43% | 74.15% | 78.37% | 74.15% | 67.26% | | | 78.03% (groups 1-4) | (group 5) |
| IndyMac INDX Mortgage Loan Trust 2006-AR21 | 77.42% | | | | | | | | |
| IndyMac INDX Mortgage Loan Trust 2006-AR23 | 68.02% | | | | | | | | |
| IndyMac INDX Mortgage Loan Trust 2006-AR25 | 74.28% | 70.90% | 76.46% | 72.11% | 77.53% | 70.60% | 74.46% | | |
| IndyMac INDX Mortgage Loan Trust 2006-AR27 | 75.41% | 71.27% | | | | | 73.61% | | |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 76.34% | | | | | | | | |
| IndyMac INDX Mortgage Loan Trust 2006-AR31 | 67.39% | | | | | | | | |

- 44 -

| Issuing Trust | Loan Group 1 | Loan Group 2 | Loan Group 3 | Loan Group 4 | Loan Group 5 | Loan Group 6 | Aggregate | Aggregate Loan Group I | Aggregate Loan Group II |
|---|---|---|---|---|---|---|---|---|---|
| IndyMac INDX Mortgage Loan Trust 2006-FLX1 | 71.36% | | | | | | | | |
| IndyMac INDX Mortgage Loan Trust 2006-R1 | 71.16% | 70.99% | | | | | undisclosed | | |
| IndyMac Residential Mortgage-Backed Trust, Series 2006-L3 | 82.92% | | | | | | | | |
| Residential Asset Securitization Trust 2006-A8 | 69.85% | 72.83% | 72.69% | | | | 72.22% | | |
| Residential Asset Securitization Trust 2006-A9CB | 73.97% | | | | | | | | |
| Residential Asset Securitization Trust 2006-A10 | 73.06% | | | | | | | | |
| Residential Asset Securitization Trust 2006-A11 | 71.99% | 71.13% | 71.86% | | | | 71.70% | | |
| Residential Asset Securitization Trust 2006-A12 | 72.62% | | | | | | | | |
| IndyMac Residential Mortgage-Backed Trust, Series 2006-L2 | 83.03% | | | | | | | | |
| IndyMac INDA Mortgage Loan Trust 2006-AR3 | 68.71% | 67.80% | | | | | 68.41% | | |



- 45 -

| Issuing Trust | Loan Group 1 | Loan Group 2 | Loan Group 3 | Loan Group 4 | Loan Group 5 | Loan Group 6 | Aggregate | Aggregate Loan Group I | Aggregate Loan Group II |
|---|---|---|---|---|---|---|---|---|---|
| IndyMac INDX Mortgage Loan Trust 2006-AR14 | 76.03% | 74.28% | | | | | 75.36% | | |
| IndyMac INDX Mortgage Loan Trust 2006-AR33 | 65.09% | 67.60% | 70.28% | 70.49% | | | | 67.19% (groups 1-3) | (group 4) |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 75.55% | 75.83% | | | | | 75.72% | | |
| IndyMac INDX Mortgage Loan Trust 2006-AR37 | 66.58% | 72.89% | | | | | undisclosed | | |
| IndyMac INDX Mortgage Loan Trust 2006-AR39 | 74.02% | | | | | | | | |
| IndyMac INDX Mortgage Loan Trust 2006-AR41 | 77.78% | | | | | | | | |
| Residential Asset Securitization Trust 2006-A13 | 73.83% | | | | | | | | |
| Residential Asset Securitization Trust 2006-A14CB | 67.82% | 75.09% | | | | | 73.32% | | |
| Residential Asset Securitization Trust 2006-A15 | 73.00% | | | | | | | | |
| Residential Asset Securitization Trust 2006-A16 | 73.39% | 73.97% | | | | | 73.62% | | |

- 46 -

| Issuing Trust | Loan Group 1 | Loan Group 2 | Loan Group 3 | Loan Group 4 | Loan Group 5 | Loan Group 6 | Aggregate | Aggregate Loan Group I | Aggregate Loan Group II |
|---|---|---|---|---|---|---|---|---|---|
| IndyMac INDA Mortgage Loan Trust 2007-AR1 | 68.59% | 67.53% | 66.29% | | | | 67.86% | | |
| IndyMac INDX Mortgage Loan Trust 2007-FLX1 | 72.61% | | | | | | | | |
| IndyMac INDX Mortgage Loan Trust 2007-AR1 | 77.02% | 76.11% | 75.72% | | | | 76.46% | | |
| IndyMac INDX Mortgage Loan Trust 2007-FLX2 | 71.40% | | | | | | | | |
| Residential Asset Securitization Trust 2007-A1 | 73.60% | | | | | | | | |
| Residential Asset Securitization Trust 2007-A2 | 71.24% | 74.63% | | | | | 72.58% | | |
| Residential Asset Securitization Trust 2007-A3 | 71.12% | 74.08% | | | | | 72.64% | | |
| IndyMac IMSC Mortgage Loan Trust 2007-F1 | 72.51% | 75.93% | | | | | 74.48% | | |
| IndyMac INDA Mortgage Loan Trust 2007-AR2 | 68.40% | | | | | | | | |
| IndyMac INDA Mortgage Loan Trust 2007-AR3 | 67.78% | 67.34% | 64.55% | | | | 66.93% | | |

- 47 -

| Issuing Trust | Loan Group 1 | Loan Group 2 | Loan Group 3 | Loan Group 4 | Loan Group 5 | Loan Group 6 | Aggregate | Aggregate Loan Group I | Aggregate Loan Group II |
|---|---|---|---|---|---|---|---|---|---|
| IndyMac INDX Mortgage Loan Trust 2007-AR11 | 76.84% | 79.02% | | | | | 77.88% | | |
| IndyMac INDX Mortgage Loan Trust 2007-AR13 | 76.05% | 72.00% | 76.81% | 78.03% | | | 76.87% | | |
| IndyMac INDX Mortgage Loan Trust 2007-AR5 | 78.41% | 74.88% | 74.11% | | | | 75.71% | | |
| IndyMac INDX Mortgage Loan Trust 2007-AR7 | 77.87% | 75.55% | | | | | 76.05% | | |
| IndyMac INDX Mortgage Loan Trust 2007-AR9 | 71.00% | 75.36% | 69.51% | | | | 71.32% | | |
| IndyMac INDX Mortgage Loan Trust 2007-FLX3 | 70.93% | | | | | | | | |
| IndyMac INDX Mortgage Loan Trust 2007-FLX4 | 69.30% | 70.33% | | | | | 69.99% | | |
| Residential Asset Securitization Trust 2007-A5 | 75.66% | 71.44% | | | | | 72.62% | | |
| Residential Asset Securitization Trust 2007-A6 | 72.15% | 75.01% | | | | | 72.95% | | |
| Residential Asset Securitization Trust 2007-A7 | 72.27% | | | | | | | | |

- 48 -

| Issuing Trust | Loan Group 1 | Loan Group 2 | Loan Group 3 | Loan Group 4 | Loan Group 5 | Loan Group 6 | Aggregate | Aggregate Loan Group I | Aggregate Loan Group II |
|---|---|---|---|---|---|---|---|---|---|
| Residential Asset Securitization Trust 2007-R1 | 71.24% | 74.71% | | | | | 72.63% | | |
| Home Equity Mortgage Loan Asset-Backed Trust, Series INDS 2006-2B | 96.86% | | | | | | | | |
| IndyMac Residential Mortgage-Backed Trust, Series 2006-L4 | 83.35% | | | | | | | | |
| IndyMac Residential Mortgage-Backed Trust, Series 2007-L1 | 84.05% | | | | | | | | |
| IndyMac IMJA Mortgage Loan Trust 2007-A1 | 68.27% | | | | | | | | |
| IndyMac IMSC Mortgage Loan Trust 2007-AR1 | 76.47% | 75.46% | 75.40% | | | | 75.52% | | |
| IndyMac IMSC Mortgage Loan Trust 2007-F2 | 67.92% | 73.31% | | | | | 70.51% | | |
| IndyMac IMSC Mortgage Loan Trust 2007-HOA1 | 74.93% | | | | | | | | |
| IndyMac INDA Mortgage Loan Trust 2007-AR4 | 68.21% | 67.60% | 65.92% | | | | 67.23% | | |

| Issuing Trust | Loan Group 1 | Loan Group 2 | Loan Group 3 | Loan Group 4 | Loan Group 5 | Loan Group 6 | Aggregate | Aggregate Loan Group I | Aggregate Loan Group II |
|---|---|---|---|---|---|---|---|---|---|
| IndyMac INDX Mortgage Loan Trust 2007-AR15 | 73.49% | 72.84% | | | | | 73.07% | | |
| IndyMac INDX Mortgage Loan Trust 2007-AR17 | 76.97% | | | | | | | | |
| IndyMac INDX Mortgage Loan Trust 2007-FLX5 | 72.57% | 70.69% | | | | | 71.12% | | |
| Residential Asset Securitization Trust 2007-A8 | 70.59% | 74.98% | 65.41% | | | | | 72.60% (groups 1 and 2) | (group 3) |
| IndyMac INDX Mortgage Loan Trust 2007-AR19 | 76.21% | 73.73% | 75.83% | | | | 74.95% | | |
| IndyMac IMSC Mortgage Loan Trust 2007-AR2 | 76.72% | | | | | | | | |
| IndyMac INDA Mortgage Loan Trust 2007-AR5 | 67.37% | 68.44% | 66.15% | | | | 66.89% | | |
| IndyMac INDX Mortgage Loan Trust 2007-FLX6 | 70.47% | 70.74% | | | | | 70.67% | | |
| Residential Asset Securitization Trust 2007-A9 | 72.10% | | | | | | | | |
| IndyMac IMJA Mortgage Loan Trust 2007-A2 | 71.43% | 70.70% | 73.26% | | | | 71.34% | | |

| Issuing Trust | Loan Group 1 | Loan Group 2 | Loan Group 3 | Loan Group 4 | Loan Group 5 | Loan Group 6 | Aggregate | Aggregate Loan Group I | Aggregate Loan Group II |
|---|---|---|---|---|---|---|---|---|---|
| IndyMac IMJA Mortgage Loan Trust 2007-A3 | 71.33% | | | | | | | | |
| IndyMac IMSC Mortgage Loan Trust 2007-F3 | 69.73% | 72.19% | 78.26% | | | | 74.84% | | |
| IndyMac INDA Mortgage Loan Trust 2007-AR6 | 67.14% | 67.07% | | | | | 67.10% | | |
| IndyMac INDA Mortgage Loan Trust 2007-AR7 | 68.86% | 67.01% | 70.42% | | | | | (group 1) | 68.73% (groups 2 and 3) |
| IndyMac IMJA Mortgage Loan Trust 2007-A4 | 73.94% | | | | | | | | |
| IndyMac INDA Mortgage Loan Trust 2007-AR8 | 72.07% | 72.55% | 72.12% | | | | 72.18% | | |
| IndyMac INDA Mortgage Loan Trust 2007-AR9 | 74.88% | 72.87% | 67.75% | | | | 70.92% | | |
| IndyMac INDX Mortgage Loan Trust 2007-AR21IP | 69.33% | 71.53% | 70.57% | 70.60% | 70.59% | 74.34%[11] | | 70.12% (groups 1 and 2) | 71.20% (groups 3-10) |

115.   The weighted average original LTV Ratios were untrue statements of material fact and failed to disclose that the ratios were materially understated due to the inclusion of mortgage loans whose property values were determined by inflated appraisals.

---

[11]   Loan Group 7 had a weighted average original loan-to-value ratio of 75.18%; Loan Group 8 of 70.70%; Loan Group 9 of 67.96%; and Loan Group 10 of 68.72%.

- 51 -

## 2. **HELOCs**

116.  With respect to the underwriting practices and guidelines Defendants purportedly adhered to when originating and/or purchasing the constituent HELOCs, the August 17, 2005, February 24, 2006, and June 2, 2006 Registration Statements, as amended, contained the same material and untrue statements as set forth above concerning the mortgage loans.

117.  The Supplemental Prospectuses for the HELOCs echoed the same material misstatements made in the Registration Statements.  For example, each HELOC Supplemental Prospectus falsely stated:

> (2) each mortgage loan was generated under a note or credit line agreement that complied, at the time of origination, in all material respects with applicable state and federal laws including all applicable anti-predatory and anti-abusive lending laws ... (5) all of the HELOCs were originated or acquired from third parties substantially **in accordance with the applicable originator's underwriting criteria in effect at the time of origination** .... (emphasis added).

> ***

> All of the HELOCs were underwritten generally in accordance with the seller's underwriting standards. ... The seller's underwriting standards with respect to the HELOCs generally will conform to those published in the seller's underwriting guidelines, including the provisions of the seller's underwriting guidelines applicable to the sellers Home Equity Line of Credit Program.

118.  The above statements were untrue statements of material fact and failed to disclose that IndyMac was not following its stated underwriting guidelines with respect to:  (1) the procurement and verification of information and documentation, including the borrower's employment, credit quality, and financial condition, in evaluating a prospective borrower's ability to meet the monthly obligations on the proposed HELOC, (2) the appraisal of the mortgaged property to be used as the underlying collateral, and (3) the LTV Ratio of the HELOCs.

119.  Like the Supplemental Prospectuses for the Certificates supported by first mortgages, the Supplemental Prospectuses for the Certificates supported by HELOCs made similar representations regarding the underwriting applied to the different loan programs IndyMac offered: "[t]he underwriting standards set forth in the seller's Home Equity Line of Credit Program provide for several different levels of documentation:  (1) the 'Full/Alternate

- 52 -

1  Documentation Program,' (2) the 'Reduced Documentation Program,' (3) the 'Pre-Approved

2  Program' and (4) the 'Invitation-to-Apply Program' (also referred to as the 'ITA Program'

3  herein)."

4      120.    With regard to the documentation requirements under each of the aforementioned

5  categories, the Supplemental Prospectuses for each HELOC made the following representations:

6      *Full/Alternate Documentation Program*

7      For Full/Alternate Documentation HELOCs, a prospective borrower is required to
fill out a detailed application providing pertinent credit information, including tax

8  returns if the borrower is self-employed or received income from dividends and
interest, rental properties or other income which can be verified via tax returns. In

9  addition, a borrower (other than a self-employed borrower) must demonstrate
income and employment directly by providing alternative documentation in the

10  form of a pay stub showing year-to-date earnings and a W-2 to provide
verification of employment. Borrowers that claim other sources of income such as

11  pension, social security, VA benefits and public assistance must provide written
documentation that identifies the source and amount of such income, such as an

12  award letter, and demonstrate that such income can reasonably be expected to
continue for at least 3 years. Income in the form of alimony, child support or

13  separate maintenance income must be substantiated by a copy of the divorce
decree or separate maintenance agreement, as applicable.

14  

15      *Reduced Documentation Program*

16      Borrowers who qualify for the Reduced Documentation Program need to provide
only verbal verification of employment, but will be required to demonstrate that

17  he or she has an average account balance of at least one month's income from
qualified assets and sources. Closing balances and mortgage loan proceeds, for

18  example, may not be used to meet this requirement. The types of assets that can
be considered in determining whether the reserve requirement has been met

19  include funds from checking, savings, money market or CD accounts, stocks,
bonds, and mutual funds. The Reduced Documentation Program is not available

20  to borrowers whose credit reports do not show that the borrower has had a
mortgage for at least 12 months within the past 3 years.

21      *Pre-Approved Program and ITA Program*

22      Borrowers who qualify under the ITA Program must provide either two current
consecutive pay stubs or two current consecutive tax returns as income

23  verification. A credit report is also required. Because borrowers who qualify
under the Pre-Approved Program have high credit scores relative to the combined

24  mortgage loan-to-value ("CLTV") on the related mortgaged properties, Pre-
Approved HELOCs require no documentation with respect to the borrowers'

25  income or employment.

26      121.    The HELOC Supplemental Prospectuses additionally represented that the

27  HELOCs complied with the following credit criteria for each level of documentation:

28      **Credit Criteria**

- 53 -

179

*Full/Alternate Documentation Program and Reduced Documentation Program*

Each borrower under the Full/Alternate Documentation Program must meet the following credit criteria:

- credit scores reported by at least 2 credit bureaus with at least 2 trade lines open for at least 12 months, or, one credit score with at least 5 trade lines open at least 12 months, or, 12 months of prior mortgage history;
- no mortgage payments thirty days or more delinquent within the last twelve months;
- no foreclosures within the last three years;
- borrower has not participated in a consumer credit counseling plan within the last two years; and
- no bankruptcy within the last two years.

The minimum credit amount for second lien HELOCs that close concurrently with a first mortgage is $10,000 for most states in which the seller originates second lien HELOCs. The minimum credit amount for first lien HELOCs or second lien HELOCs that do not close concurrently with a first mortgage is $10,000.

*Pre-Approved Program and ITA Program*

Each borrower under either the Pre-Approved Program or the Invitation-to-Apply Program (also referred to as the "ITA Program" herein) must meet the following credit criteria:

- no bankruptcy, foreclosures, repossessions or debt counseling within the past 3 years;
- no charge-offs, unpaid collections, tax liens or judgments in an amount over $1,000;
- no payment delinquency of 60 days or more on any trade within the past year;
- no payment delinquency of 30 days or more on a mortgage or home equity line of credit within the past 2 years;
- no non-standard addresses should be shown on the credit report(i.e., P.O. Boxes)(applicable only to Pre-Approved HELOCs); and
- miscellaneous status codes (i.e., I.D. Theft) are not allowed(applicable only to Pre-Approved HELOCs).

122.   These representations were untrue statements of material fact and failed to disclose that because IndyMac had become so extremely aggressive in making loans that many of the loans were made to borrowers who had not submitted the required documentation or were made to borrowers based on misrepresented documentation.

123.   The HELOC Supplemental Prospectuses also contained material and untrue statements with respect to the underwriting guidelines used to determine the value of the underlying collateral for HELOCs included in the Issuing Trusts:

- 54 -

**Appraisal Requirements**

*Full/Alternate Documentation Program and Reduced Documentation Program*

Appraisal requirements differ depending on the mortgage type and loan amounts. For second lien HELOCs originated concurrently with a first mortgage, a copy of the appraisal and a set of original photos used for the origination of the new first mortgage are required. For second lien HELOCs that are not originated concurrently with a first mortgage, if the loan amount is less than $100,000, either an Appraisal Value Model (AVM) or a Freddie Mac form 2055 (Quantitative Analysis Report with exterior inspection only) may be used, depending on whether the AVM provides an appraised value. For second lien HELOCs that are not originated concurrently with a first mortgage, if the loan amount is greater than $100,000, but less than $250,000, a Freddie Mac form 2055 (Quantitative Analysis Appraisal Report with exterior inspection only) is required and the report must include a photo of the front view of the subject property, a location map and comparable sales. For second lien HELOCs that are not originated concurrently with a first mortgage, if the loan amount is greater than $250,000, a Freddie Mac form 1004 (Full Appraisal) is required.

*Pre-Approved Program and ITA Program*

The appraisal requirement is dependent upon the loan amount and is as follows:

- loan amounts less than $75,000: an appraised value generated by the Appraisal Value Model ("AVM")
- loan amounts between $75,001 to $100,000: desktop appraisal
- loan amounts between $100,001 to $150,000: drive-by appraisal
- loan amounts between $150,000 to $200,000: full appraisal.

124.    The above statements were untrue statements of material fact and failed to disclose IndyMac's ongoing practice of systematically inflating appraisals for properties which failed to satisfy its threshold for adequate LTV ratios for mortgages and HELOCs included in the Issuing Trusts.

125.    Each HELOC Supplemental Prospectus also disclosed the weighted average original LTV Ratio of the mortgage loans as of the cut-off date within the Issuing Trusts, as set forth in the following chart:

| Issuing Trust | Aggregate LTV |
|---|---|
| IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series 2006-H1 | 83.56% |
| IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series 2006-H2 | 81.57% |
| IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series 2006-H3 | 83.39% |
| IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series 2007-H1 | 83.73% |

- 55 -

| Issuing Trust | Aggregate LTV |
|---|---|
| IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series 2006-H4 | 80.82% |

126.     The weighted average original LTV Ratios were material and untrue when made because the ratios were materially understated due to the inclusion of HELOCs whose property values were determined by inflated appraisals.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

127.     Plaintiff brings this action on its own behalf and as a class action pursuant to Civil Rule 23 on behalf of all persons and entities who, during the Class Period, purchased or otherwise acquired the Certificates of the Issuing Trusts pursuant or traceable to the false and misleading Registration Statements, Prospectuses and Supplemental Prospectuses, and who were damaged thereby (the "Class").

128.     Excluded from the Class are the Defendants, their officers and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

129.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.

130.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class action and securities litigation. Plaintiff has no interests that are contrary or in conflict with those of the Class members that Plaintiff seeks to represent.

131.     Plaintiff's claims are typical of the claims of the Class members. Plaintiff and all members of the Class purchased the Certificates pursuant to Registration Statements, Prospectuses and Supplemental Prospectuses and has sustained damages as a result of the wrongful conduct complained of herein.

- 56 -

182

132.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members individually to redress for the wrongful conduct alleged herein.

133.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    (i)    Whether the federal securities laws were violated by the Defendants' acts and omissions as alleged herein;

    (ii)    Whether documents, including the Registration Statements, Prospectuses and Supplemental Prospectuses, that IndyMac ABS and IndyMac MBS filed with the SEC during the Class Period contained misstatements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    (iii)    Whether the market prices of the Certificates during the Class Period were artificially inflated due to the material misrepresentations and omissions complained of herein; and

    (iv)    Whether the Class members have sustained damages and, if so, the appropriate measure thereof.

134.    Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

135.    The names and addresses of the record owners of the Certificates purchased during the Class Period are available from IndyMac ABS and IndyMac MBS and/or its transfer agent(s).  Notice can be provided to persons who purchased or otherwise acquired the Certificates by a combination of published notice and first class mail, using techniques and forms of notice similar to those customarily used in other class actions arising under in state and federal securities class actions.

- 57 -

## CAUSES OF ACTION

## COUNT ONE

**Against the IndyMac Defendants
and the Underwriter Defendants for
Violation of Section 11 of the Securities Act**

136.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Plaintiff and all Class members who purchased the Certificates pursuant or traceable to the Registration Statements filed with the SEC on August 15, 2005, August 17, 2005, February 24, 2006, as amended, June 2, 2006, as amended, and February 14, 2007, as amended, and the corresponding Prospectuses and Supplemental Prospectuses.

137.   This Count is not based on and does not sound in fraud. All preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. This Count is predicated upon Defendants' strict liability for making false and materially misleading statements in the Registration Statements, the Prospectuses, and Supplemental Prospectuses.

138.   This Count is asserted against: (a) IndyMac ABS and IndyMac MBS, (b) the Issuing Trusts, which issued the Certificates offered to the investing public, (c) the Individual Defendants, all of whom signed the Registration Statements and were officers and/or directors of IndyMac ABS and/or IndyMac MBS at the time, and (d) the Underwriter Defendants who served as underwriters for the offerings of the Certificates.

139.   The Registration Statements and each of the Prospectuses and Supplemental Prospectuses were materially false and misleading and contained untrue statements of material fact and omitted to state material facts necessary to make the statements made therein, under the circumstances in which they were made, not misleading, as set forth above.

140.   None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements and each of the Prospectuses and Supplemental Prospectuses were accurate and complete in all material respects. Had they exercised reasonable care, the Defendants named in this Count could have known of the material misstatements and omissions alleged herein.

- 58 -

1    141.   At the time they purchased the Certificates, Plaintiff and members of the Class

2  did not know, or by the reasonable exercise of care could have known, of the material

3  misstatements and omissions alleged herein.

4    142.   In connection with the Registration Statements and offering of the Certificates, the

5  Defendants named in this Count, directly or indirectly, used the means and instrumentalities of

6  interstate commerce, the United States mails and a national securities exchange.

7    143.   This Count is brought within one year after discovery of the untrue statements

8  and omissions in the Registration Statements, the Prospectuses and Supplemental Prospectuses,

9  and within three years after the Certificates were sold to Plaintiff and members of the Class.

10    144.   Plaintiff and the Class members acquired the Certificates pursuant or traceable to

11  the Registration Statements before IndyMac ABS and IndyMac MBS made generally available

12  to its security holders an earnings statement covering a period of at least twelve months

13  beginning after the effective date of the Registration Statements.

14    145.   By reason of the misconduct alleged herein, the Defendants named in this Count

15  violated Section 11 of the Securities Act and are liable to the Plaintiff and the Class members

16  who purchased or acquired the Certificates pursuant or traceable to the Registration Statements,

17  each of whom has been damaged as a result of such violations.

18                                    **COUNT TWO**

19          **Against the IndyMac MBS, IndyMac ABS, the Underwriter
            Defendants, and the Rating Agency Defendants for**

20          <u>**Violation of Section 12(a)(2) of the Securities Act**</u>

21    146.   Plaintiff repeats and realleges each and every allegation contained above as if

22  fully set forth herein. This Count is brought pursuant to Section 12(a)(2) of the Securities Act,

23  15 U.S.C. § 77*l*(a)(2) on behalf of the Plaintiff and all members of the Class who purchased or

24  otherwise acquired the Certificates pursuant to the Registration Statements, Prospectuses and

25  Supplemental Prospectuses.

26    147.   This Count is not based on and does not sound in fraud. All preceding allegations

27  of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

28

- 59 -

185

148.   This Count is brought against IndyMac ABS, IndyMac MBS, the Underwriter Defendants, and the Rating Agency Defendants each of whom offered and sold Certificates to Class members by the use of communication in interstate commerce and/or the United States mails, by means of the Registration Statement, Prospectuses and Supplemental Prospectuses.

149.   Specifically, in connection with the Issuing Trusts, IndyMac ABS and IndyMac MBS selected the Underwriter Defendants to underwrite and promote the Certificates.  Pursuant to an underwriting agreement, IndyMac ABS and IndyMac MBS issued and the Underwriter Defendants underwrote and promoted the sale of the Certificates to the investing public.

150.   The Rating Agency Defendants were "substantial participants" in the Offering of certain of the Certificates identified in ¶ 28 herein, and are therefore liable as "sellers" under Section 12(a)(2) of the Securities Act.

151.   IndyMac ABS, IndyMac MBS, the Underwriter Defendants and the Rating Agency Defendants participated in the preparation and dissemination of the false and misleading Registration Statements, Prospectuses and Supplemental Prospectuses for their own financial benefit.  But for their participation in the sale of the Certificates to the investing public, including their solicitation as set forth herein, the sale of the Certificates could not and would not have been accomplished.  Specifically, IndyMac ABS, IndyMac MBS, the Underwriter Defendants, and the Rating Agency Defendants:

(i)   Made the decision to offer the Certificates for sale to the investing public. IndyMac ABS, IndyMac MBS, and the Underwriter Defendants drafted, revised and/or approved the Registration Statements, Prospectuses and Supplemental Prospectuses.  These written materials were calculated to create interest in the Certificates and were widely distributed by or on behalf of the Defendants named in this Count for that purpose;

(ii)   Finalized the Registration Statements, the Prospectuses and Supplemental Prospectuses, and caused them to become effective; and

(iii)   Conceived and planned the sale of the Certificates and orchestrated all activities necessary to affect the sale of the Certificates to the investing public, by issuing the Certificates, promoting the Certificates and supervising their distribution and ultimate sale to the investing public.

- 60 -

186

1    152.   As set forth more specifically above, the Registration Statements, Prospectuses

2  and Supplemental Prospectuses contained untrue statements of material fact and omitted

3  material facts necessary in order to make the statements, in light of circumstances in which they

4  were made, not misleading.

5    153.   Plaintiff and the members of the Class did not know, nor could they have known,

6  of the untruths or omissions contained in the Registration Statements, the Prospectuses and

7  Supplemental Prospectuses.

8    154.   IndyMac ABS, IndyMac MBS, the Underwriter Defendants and the Rating

9  Agency Defendants were obligated to make a reasonable and diligent investigation of the

10  statements contained in the Registration Statements, the Prospectuses and Supplemental

11  Prospectuses to ensure that such statements were true and that there was no omission of material

12  fact required to be stated in order to make the statements contained therein not misleading.

13  IndyMac ABS, IndyMac MBS, the Underwriter Defendants, and the Rating Agency Defendants

14  did not make a reasonable investigation and did not possess reasonable grounds for the belief

15  that the statements contained in the Registration Statements, Prospectuses and Supplemental

16  Prospectuses were accurate and complete in all material respects.  Had they done so, these

17  Defendants could have known of the material misstatements and omissions alleged herein.

18    155.   This Count is brought within one year after discovery of the untrue statements

19  and omissions in the Registration Statements, the Prospectuses and Supplemental Prospectuses

20  and within three years after the Certificates were sold to Plaintiff and Class members in

21  connection with the Issuing Trusts.

22    156.   By reason of the misconduct alleged herein, the Defendants named in this Count

23  violated Section 12(a)(2) of the Securities Act and are liable to Plaintiff and members of the

24  Class who purchased or acquired the Certificates pursuant or traceable to the Registration

25  Statements, the Prospectuses and Supplemental Prospectuses, each of whom has been damaged

26  as a result of such violation.

27    157.   Plaintiff and the members of the Class who purchased the Certificates pursuant to

28  the Registration Statements, the Prospectuses and Supplemental Prospectuses hereby seek

- 61 -

187

rescission of their purchases and tender to the Defendants named in this Count any Certificates that Plaintiff and other members of the Class continue to own, in return for the consideration paid for those Certificates, together with interest thereon.

### COUNT THREE

**Against the Individual Defendants**
**for Violation of Section 15 of the Securities Act**

158. Plaintiff repeats and realleges each and every allegation above as if set forth fully herein. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Plaintiff and all members of the Class who purchased or otherwise acquired the Certificates pursuant or traceable to the Registration Statements, Prospectuses and Supplemental Prospectuses.

159. This Count is not based on and does not sound in fraud. All preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

160. For all the reasons set forth above in Counts One and Two, the Individual Defendants are controlling entities or persons of IndyMac ABS and IndyMac MBS and are liable to Plaintiff and the members of the Class who purchased the Certificates pursuant or traceable to the materially false and misleading statements and omissions contained in the Registration Statements, Prospectuses and Supplemental Prospectuses, pursuant to Sections 11 and 12(a)(2) of the Securities Act, and were damaged thereby.

161. This Count is asserted against the Individual Defendants, each of whom was a control person of IndyMac ABS and IndyMac MBS during the Class Period, within the meaning of Section 15 of the Securities Act, by virtue of their control, ownership, offices, directorship, and specific acts. As control persons, the Individual Defendants had the power and influence, and exercised the same, to cause IndyMac ABS and IndyMac MBS to engage in the acts described herein.

- 62 -

162.   The Individual Defendants' control, ownership and positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and members of the Class.

163.   By virtue of the conduct alleged herein, for which IndyMac ABS and IndyMac MBS are primarily liable, as set forth above, the Individual Defendants are jointly and severally liable with and to the same extent as IndyMac ABS and IndyMac MBS, pursuant to Section 15 of the Securities Act.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

    (a)   Determining that this action is a proper class action pursuant to Civil Rule 23;

    (b)   Awarding compensatory and rescissory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    (c)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

    (d)   Such other and further relief as the Court may deem just and proper.

Dated: January 20, 2009

                 KREINDLER & KREINDLER LLP
                 MARK I. LABATON, ESQ. (SBN 159555)

                 MARK I. LABATON

                 707 Wilshire Boulevard, Suite 4100
                 Los Angeles, CA 90017
                 Telephone:   (213) 622-6469
                 Facsimile:   (213) 622-6019

- 63 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER, ESQ.
PAUL SCARLATO, ESQ.
LAURA S. KILLIAN, ESQ.
STEFANIE J. SUNDEL, ESQ.
140 Broadway
New York, NY 10005
Telephone:   (212) 907-0700
Facsimile:   (212) 818-0477

- 64 -

## DEMAND FOR JURY TRIAL

Plaintiff respectfully requests that a jury be empaneled to decide all factual issues of this case.

Dated: January 20, 2009

KREINDLER & KREINDLER LLP
MARK I. LABATON, ESQ. (SBN 159555)

_____
MARK I. LABATON

707 Wilshire Boulevard, Suite 4100
Los Angeles, CA 90017
Telephone:    (213) 622-6469
Facsimile:    (213) 622-6019

LABATON SUCHAROW  LLP
CHRISTOPHER J. KELLER, ESQ.
PAUL SCARLATO, ESQ.
LAURA S. KILLIAN, ESQ.
STEFANIE J. SUNDEL, ESQ.
140 Broadway
New York, NY 10005
Telephone:    (212) 907-0700
Facsimile:    (212) 818-0477

- 65 -

191

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES     BC405843
NOTICE OF CASE ASSIGNMENT - UNLIMITED CIVIL CASE
Case Number _____

## THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

Your case is assigned for all purposes to the judicial officer indicated below (Local Rule 7.3(c)).  There is additional information on the reverse side of this form.

| ASSIGNED JUDGE | DEPT | ROOM | ASSIGNED JUDGE | DEPT | ROOM | |
|---|---|---|---|---|---|---|
| Hon. Elihu M. Berle | 1 | 534 | Hon. Holly E. Kendig | 42 | 416 | |
| Hon. J. Stephen Czuleger | 3 | 224 | Hon. Mel Red Recana | 45 | 529 | |
| Hon. Luis A. Lavin | 13 | 630 | Hon. Aurelio Munoz | 47 | 507 | |
| Hon. Terry A. Green | 14 | 300 | Hon. Elizabeth Allen White | 48 | 506 | |
| Hon. Richard Fruin | 15 | 307 | Hon. Conrad Aragon | 49 | 509 | |
| Hon. Rita Miller | 16 | 306 | Hon. John Shepard Wiley Jr. | 50 | 508 | |
| Hon. Mary Thornton House | 17 | 309 | Hon. Abraham Khan | 51 | 511 | |
| Hon. Helen I. Bendix | 18 | 308 | Hon. Susan Bryant-Deason | 52 | 510 | |
| Hon. Judith C. Chirlin | 19 | 311 | Hon. John P. Shook | 53 | 513 | |
| Hon. Kevin C. Brazile | 20 | 310 | Hon. Ernest M. Hiroshige | 54 | 512 | |
| Hon. Zaven V. Sinanian | 23 | 315 | Hon. Malcolm H. Mackey | 55 | 515 | |
| Hon. Robert L. Hess | 24 | 314 | Hon. Jane L. Johnson | 56 | 514 | |
| Hon. Mary Ann Murphy | 25 | 317 | Hon. Ralph W. Dau | 57 | 517 | |
| Hon. James R. Dunn | 26 | 316 | Hon. Rolf M. Treu | 58 | 516 | |
| Hon. Yvette M. Palazuelos | 28 | 318 | Hon. David L. Minning | 61 | 632 | |
| Hon. John A. Kronstadt | 30 | 400 | Hon. Michael L. Stern | 62 | 600 | |
| Hon. Alan S. Rosenfield | 31 | 407 | Hon. Kenneth R. Freeman | 64 | 601 | |
| Hon. Mary H. Strobel | 32 | 406 | Hon. Mark Mooney | 68 | 617 | |
| Hon. Charles F. Palmer | 33 | 409 | Hon. Edward A. Ferns | 69 | 621 | |
| Hon. Amy D. Hogue | 34 | 408 | Hon. Soussan G. Bruguera | 71 | 729 | |
| Hon. Gregory Alarcon | 36 | 410 | Hon. Ruth Ann Kwan | 72 | 731 | |
| Hon. Joanne O'Donnell | 37 | 413 | Hon. Teresa Sanchez-Gordon | 74 | 735 | |
| Hon. Maureen Duffy-Lewis | 38 | 412 | Hon. William F. Fahey | 78 | 730 | |
| Hon. Michael C. Solner | 39 | 415 | Hon. Carl J. West* | 311 | CCW | |
| Hon. Ann I. Jones | 40 | 414 | Other | | | |
| Hon. Ronald M. Sohigian | 41 | 417 | | | | |

*Class Actions
All class actions are initially assigned to Judge Carl J. West in Department 311 of the Central Civil West Courthouse (600 S. Commonwealth Ave., Los Angeles 90005).
This assignment is for pretrial purposes and for the purpose of assessing whether or not the case is complex within the meaning of California Rules of Court, rule 3.400.
Depending on the outcome of that assessment, the class action case may be reassigned to one of the judges of the Complex Litigation Program or reassigned randomly
to a court in the Central District.

Given to the Plaintiff/Cross-Complainant/Attorney of Record on _____     JOHN A. CLARKE, Executive Officer/Clerk
                                                                    By _____, Deputy Clerk

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the Chapter Seven Rules, as applicable in the Central District, are summarized for your assistance.

### APPLICATION

The Chapter Seven Rules were effective January 1, 1994. They apply to all general civil cases.

### PRIORITY OVER OTHER RULES

The Chapter Seven Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE

A challenge under Code of Civil Procedure section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS

Cases assigned to the Individual Calendaring Court will be subject to processing under the following time standards:

**COMPLAINTS:** All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days of filing.

**CROSS-COMPLAINTS:** Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

A Status Conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE

The Court will require the parties at a status conference not more than 10 days before the trial to have timely filed and served all motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested jury instructions, and special jury instructions and special jury verdicts. These matters may be heard and resolved at this conference. At least 5 days before this conference, counsel must also have exchanged lists of exhibits and witnesses and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Eight of the Los Angeles Superior Court Rules.

### SANCTIONS

The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Seven Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Seven Rules. Such sanctions may be on a party or if appropriate on counsel for the party.

**This is not a complete delineation of the Chapter Seven Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is absolutely imperative.**

LACIV CCH 190 (Rev. 01/09)
LASC Approved 05-06

NOTICE OF CASE ASSIGNMENT –
UNLIMITED CIVIL CASE

Page 2 of 2

193

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## ALTERNATIVE DISPUTE RESOLUTION INFORMATION PACKAGE
[CRC 3.221 Information about Alternative Dispute Resolution]

The plaintiff shall serve a copy of this Information Package on each defendant along with the complaint (**Civil only**).

**What Is ADR:**
Alternative Dispute Resolution (ADR) is the term used to describe all the other options available for settling a dispute which once had to be settled in court. ADR processes, such as arbitration, mediation, neutral evaluation (NE), and settlement conferences, are less formal than a court process and provide opportunities for parties to reach an agreement using a problem-solving approach.

There are many different kinds of ADR. All of them utilize a "neutral", an impartial person, to decide the case or help the parties reach an agreement.

**Mediation:**
In mediation, a neutral person called a "mediator" helps the parties try to reach a mutually acceptable resolution of the dispute. The mediator does not decide the dispute but helps the parties communicate so they can try to settle the dispute themselves. Mediation leaves control of the outcome with the parties.

> **Cases for Which Mediation May Be Appropriate**
> Mediation may be particularly useful when parties have a dispute between or among family members, neighbors, or business partners. Mediation is also effective when emotions are getting in the way of resolution. An effective mediator can hear the parties out and help them communicate with each other in an effective and nondestructive manner.
>
> **Cases for Which Mediation May <u>Not</u> Be Appropriate**
> Mediation may not be effective if one of the parties is unwilling to cooperate or compromise. Mediation also may not be effective if one of the parties has a significant advantage in power over the other. Therefore, it may not be a good choice if the parties have a history of abuse or victimization.

**Arbitration:**
In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are often relaxed. Arbitration may be either "binding" or "nonbinding." *Binding arbitration* means that the parties waive their right to a trial and agree to accept the arbitrator's decision as final. *Nonbinding* arbitration means that the parties are free to request a trial if they do not accept the arbitrator's decision.

> **Cases for Which Arbitration May Be Appropriate**
> Arbitration is best for cases where the parties want another person to decide the outcome of their dispute for them but would like to avoid the formality, time, and expense of a trial. It may also be appropriate for complex matters where the parties want a decision-maker who has training or experience in the subject matter of the dispute.
>
> **Cases for Which Arbitration May <u>Not</u> Be Appropriate**
> If parties want to retain control over how their dispute is resolved, arbitration, particularly binding arbitration, is not appropriate. In binding arbitration, the parties generally cannot appeal the arbitrator's award, even if it is not supported by the evidence or the law. Even in nonbinding arbitration, if a party requests a trial and does not receive a more favorable result at trial than in arbitration, there may be penalties.

**Neutral Evaluation:**
In neutral evaluation, each party gets a chance to present the case to a neutral person called an "evaluator." The evaluator then gives an opinion on the strengths and weaknesses of each party's evidence and arguments and about how the dispute could be resolved. The evaluator is often an expert in the subject matter of the dispute. Although the evaluator's opinion is not binding, the parties typically use it as a basis for trying to negotiate a resolution of the dispute.

> **Cases for Which Neutral Evaluation May Be Appropriate**
> Neutral evaluation may be most appropriate in cases in which there are technical issues that require special expertise to resolve or the only significant issue in the case is the amount of damages.
>
> **Cases for Which Neutral Evaluation May <u>Not</u> Be Appropriate**
> Neutral evaluation may not be appropriate when there are significant personal or emotional barriers to resolving the dispute.

**Settlement Conferences:**
Settlement conferences may be either mandatory or voluntary. In both types of settlement conferences, the parties and their attorneys meet with a judge or a neutral person called a "settlement officer" to discuss possible settlement of their dispute. The judge or settlement officer does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Settlement conferences are appropriate in any case where settlement is an option. Mandatory settlement conferences are often held close to the date a case is set for trial.

LAADR 005 (Rev. 08/08)
LASC Approval 10-03

Page 1 of 2

## LOS ANGELES SUPERIOR COURT ADR PROGRAMS

CIVIL:
- **Civil Action Mediation** (Governed by Code of Civil Procedure (CCP) sections 1775-1775.15, California Rules of Court, rules 3.850-3.868 and 3.870-3.878, Evidence Code sections 1115-1128, and Los Angeles Superior Court Rules, chapter 12.)
- **Retired Judge Settlement Conference**
- **Neutral Evaluation** (Governed by Los Angeles Superior Court Rules, chapter 12.)
- **Judicial Arbitration** (Governed by Code of Civil Procedure sections 1141.10-1141.31, California Rules of Court, rules 3.810-3.830, and Los Angeles Superior Court Rules, chapter 12.)
- **Eminent Domain Mediation** (Governed by Code of Civil Procedure section 1250.420.)
- **Civil Harassment Mediation**
- **Small Claims Mediation**

FAMILY LAW (non-custody):
- **Mediation**
- **Forensic Certified Public Accountant (CPA) Settlement Conference**
- **Settlement Conference**
- **Nonbinding Arbitration** (Governed by Family Code section 2554.)

PROBATE:
- **Mediation**
- **Settlement Conference**

## NEUTRAL SELECTION

Parties may select a mediator, neutral evaluator, or arbitrator from the Court Party Pay Panel or may hire someone privately, at their discretion. If the parties utilize the Pro Bono Mediation or Arbitration Panel, the parties will be assigned on a random basis the name of one neutral who meets the case criteria entered on the court's website.

## COURT ADR PANELS

**Party Pay Panel**   The Party Pay Panel consists of mediators, neutral evaluators, and arbitrators who have achieved a specified level of experience in court-connected cases. The parties (collectively) may be charged $150.00 per hour for the first three hours of hearing time. Thereafter, the parties may be charged for additional hearing time on an hourly basis at rates established by the neutral if the parties consent in writing.

**Pro Bono Panel**   The Pro Bono Panel consists of trained mediators, neutral evaluators, and arbitrators who have not yet gained the experience to qualify for the Party Pay Panel, as well as experienced neutrals who make themselves available pro bono as a way of supporting the judicial system. It is the policy of the Court that all pro bono volunteer mediators, neutral evaluators, and arbitrators provide three hours hearing time per case. Thereafter, the parties may be charged for additional hearing time on an hourly basis at rates established by the neutral if the parties consent in writing.

**Private Neutral**   The market rate for private neutrals can range from $300-$1,000 per hour.

## ADR ASSISTANCE

For assistance regarding ADR, please contact the ADR clerk at the courthouse in which your case was filed.

| COURTHOUSE | ADDRESS | ROOM | CITY | PHONE | FAX |
|---|---|---|---|---|---|
| Antonovich | 42011 4th St. West | None | Lancaster, CA  93534 | (661)974-7275 | (661)974-7060 |
| Chatsworth | 9425 Penfield Ave. | 1200 | Chatsworth, CA  91311 | (818)576-8565 | (818)576-8687 |
| Compton | 200 W. Compton Blvd. | 1002 | Compton, CA  90220 | (310)603-3072 | (310)223-0337 |
| Glendale | 600 E. Broadway | 273 | Glendale, CA  91206 | (818)500-3160 | (818)548-5470 |
| Long Beach | 415 W. Ocean Blvd. | 316 | Long Beach, CA  90802 | (562)491-6272 | (562)437-3802 |
| Norwalk | 12720 Norwalk Blvd. | 308 | Norwalk, CA  90650 | (562)807-7243 | (562)462-9019 |
| Pasadena | 300 E. Walnut St. | 109 | Pasadena, CA  91101 | (626)356-5685 | (626)666-1774 |
| Pomona | 400 Civic Center Plaza | 106 | Pomona, CA  91766 | (909)620-3183 | (909)629-6283 |
| San Pedro | 505 S. Centre | 209 | San Pedro, CA  90731 | (310)519-6151 | (310)514-0314 |
| Santa Monica | 1725 Main St. | 203 | Santa Monica, CA  90401 | (310)260-1829 | (310)319-6130 |
| Stanley Mosk | 111 N. Hill St. | 113 | Los Angeles, CA  90012 | (213)974-5425 | (213)633-5115 |
| Torrance | 825 Maple Ave. | 100 | Torrance, CA  90503 | (310)222-1701 | (310)782-7326 |
| Van Nuys | 6230 Sylmar Ave. | 418 | Van Nuys, CA  91401 | (818)374-2337 | (818)902-2440 |

For additional information, visit the Court ADR web application at **www.lasuperiorcourt.org** (click on ADR).

Partially Funded by the Los Angeles County Dispute Resolution Program

LAADR 005 (Rev. 08/08)
LASC Approval 10-03

Page 2 of 2

195

# LOS ANGELES COUNTY
# DISPUTE RESOLUTION PROGRAMS ACT (DRPA) CONTRACTORS

The following organizations provide mediation services under contract with the Los Angeles County Department of Community & Senior Services. Services are provided to parties in any civil case filed in the Los Angeles County Superior Court. Services are not provided under this program to family, probate, traffic, criminal, appellate, mental health, unlawful detainer/eviction or juvenile court cases.

**Asian-Pacific American Dispute Resolution Center**
**(213) 250-8190**
(Spanish & Asian languages capability)

**California Academy of Mediation Professionals**
**(818) 377-7250**

**Center for Conflict Resolution**
**(818) 380-1840**

**Inland Valleys Justice Center**
**(909) 397-5780**
(Spanish language capability)

**Office of the Los Angeles City Attorney Dispute Resolution Program**
**(213) 485-8324**
(Spanish language capability)

**Los Angeles County Bar Association Dispute Resolution Services**
**toll free number 1-877-4Resolve (737-6583) or (213) 896-6533**
(Spanish language capability)

**Los Angeles County Department of Consumer Affairs**
**(213) 974-0825**
(Spanish language capability)

**The Loyola Law School Center for Conflict Resolution**
**(213) 736-1145**
(Spanish language capability)

**Martin Luther King Legacy Association Dispute Resolution Center**
**(323) 290-4132**
(Spanish language capability)

**City of Norwalk**
**(562) 929-5603**

---

DRPA Contractors do not provide legal advice or assistance, including help with responding to summonses. Accessing these services does not negate any responsibility you have to respond to a summons or appear at any set court date. See the reverse side of this sheet for information on the mediation process and obtaining legal advice.

---

## THIS IS A TWO-SIDED DOCUMENT.

LAADR 007 07-04
LASC Approved

Page 1 of 2

**What is the goal of mediation?**

The goal is to assist the parties in reaching a mutually acceptable agreement or understanding on some or all of the issues. The parties jointly become the primary decision maker in how to resolve the issues as opposed to the traditional judge and/or jury system.

**Do I need an attorney for this?**

While it is recommended to have an attorney and/or receive legal advice before the mediation starts, you are not required to have representation. If you do have an attorney, they may participate in the mediation with you.

**How long does it take?**

Face-to-face mediations generally last one to three hours. Telephone conciliations, in which the parties do not meet face to face, vary from a few days to several weeks. Much depends on the number of parties involved and the complexities of the issues. When the mediation takes place depends on parties scheduling availability.

| **A Mediator helps parties. . .** | **A Mediator does not...** |
|---|---|
| ♦ Have productive discussions | ♦ Provide advice or opinions |
| ♦ Avoid or break impasses | ♦ Offer legal information |
| ♦ Defuse controversy | ♦ Make decisions for parties |
| ♦ Generate options that have potential for mutual gain | ♦ Represent or advocate for either side |
| ♦ Better understand each other's concerns and goals | ♦ Judge or evaluate anyone or anything |
| ♦ Focus on their interests rather than their positions | ♦ Conduct research |
| | ♦ "Take Sides" |

| **What does it cost?** | **Legal Advice/Information** |
|---|---|
| The first three hours of any mediation are free. Thereafter, charges are based on income or revenue. All fees are waived for low-income individuals. | **If you want to retain an attorney,** a list of state certified referral services is at courtinfo.ca.gov which also has an on-line self help legal center.<br><br>**Self-Help Legal Access Centers** are at the Inglewood, Palmdale, Pomona, and Van Nuys courthouses.  nls-la.org and lafla.org |
| **What is the difference between the contractors listed and the Superior Court ADR Office?**<br><br>The services offered by the contractors listed may be accessed immediately. Those offered by the Superior Court ADR Office, also a DRPA contractor, may not be accessed by parties until a court appearance, or at the directive of the judge assigned to the case. | **Court Personnel** can answer non-legal questions (forms, fees, fee waivers).  lasuperiorcourt.org<br><br>**Low-income individuals** may qualify for help from non-profit legal organizations. Court Personnel and DRPA contractors have such listings. |

**Dispute Resolution Programs Act (DRPA) Grants Administration Office**
**(213) 738-2621**
**(The DRP Office is not a Superior Court Office.  Consult your phone directory to locate the number of the Court Office on your summons.)**

**THIS IS A TWO-SIDED DOCUMENT.**

LAADR 007 07-04
LASC Approved

Page 2 of 2

| NAME, ADDRESS, AND TELEPHONE NUMBER OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION TO PARTICIPATE IN ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER: |
|---|---|

The undersigned parties stipulate to participate in an Alternative Dispute Resolution (ADR) process in the above-entitled action, as follows:

☐ Mediation

☐ Non-Binding Arbitration

☐ Binding Arbitration

☐ Early Neutral Evaluation

☐ Settlement Conference

☐ Other ADR Process *(describe)*: _____

Dated: _____

| Name of Stipulating Party | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|
| ☐ Plaintiff ☐ Defendant ☐ Cross-defendant | | |
| Name of Stipulating Party | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
| ☐ Plaintiff ☐ Defendant ☐ Cross-defendant | | |
| Name of Stipulating Party | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
| ☐ Plaintiff ☐ Defendant ☐ Cross-defendant | | |
| Name of Stipulating Party | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
| ☐ Plaintiff ☐ Defendant ☐ Cross-defendant | | |

☐ Additional signature(s) on reverse

LAADR 001 10-04
LASC Approved
(Rev. 01-07)

**STIPULATION TO PARTICIPATE IN
ALTERNATIVE DISPUTE RESOLUTION (ADR)**

Cal. Rules of Court, rule 3.221
Page 1 of 2

| Short Title | Case Number |
|---|---|
| | |

Name of Stipulating Party
☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant

Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney

Name of Stipulating Party
☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant

Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney

Name of Stipulating Party
☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant

Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney

Name of Stipulating Party
☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant

Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney

Name of Stipulating Party
☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant

Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney

Name of Stipulating Party
☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant

Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney

Name of Stipulating Party
☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant

Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney

Name of Stipulating Party
☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant

Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney

Name of Stipulating Party
☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant

Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney

Name of Stipulating Party
☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant

Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney

LAADR 001 10-04
LASC Approved
(Rev. 01-07)

**STIPULATION TO PARTICIPATE IN
ALTERNATIVE DISPUTE RESOLUTION (ADR)**

Cal. Rules of Court, rule 3.221
Page 2 of 2

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 01/29/09                                                              DEPT. 311

HONORABLE Carl J. West          JUDGE  R. Rully          DEPUTY CLERK

HONORABLE                    JUDGE PRO TEM          ELECTRONIC RECORDING MONITOR

      none            Deputy Sheriff  none                    Reporter

| | | |
|---|---|---|
| 8:30 am | BC405843 | Plaintiff Counsel |
| | IBEW LOCAL 103 | no appearances |
| | VS | Defendant |
| | INDYMAC MBS INC ET AL | Counsel |
| | DEEMED COMPLEX 1-29-09 | |

NATURE OF PROCEEDINGS:

COURT ORDER

This Court makes it determination whether or not this
case should be deemed complex pursuant to Rule 3.400
of the California Rules of Court.

This case is designated complex and is reassigned to
Judge Victoria Chaney in Department 324 at
the Central Civil West Courthouse for all further
proceedings and for all purposes.

The case is ordered stayed until the initial status
conference date. Notice of Initial Status Conference
is to be given by the Clerk in Department 324.  No
responsive pleadings may be filed. Parties may file
a Notice of Appearance in lieu of an answer or other
responsive pleading. The filing of a Notice of
Appearance shall not constitute a general appearance
and shall not waive any substantive or procedural
challenge to the complaint. Nothing herein stays the
time for filing affidavit of prejudice pursuant to
Code of Civil Procedure section 170.6.

Pursuant to Government Code section 70616 (c), each
party is ordered to pay $550.00 for complex fees,
payable to Los Angeles Superior Court, within ten (10)
calendar days from this date.

Plaintiff is ordered to serve a copy of this minute
order on all parties forthwith and file a proof of

                    Page    1 of  3    DEPT. 311

| |
|---|
| MINUTES ENTERED |
| 01/29/09 |
| COUNTY CLERK |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 01/29/09

DEPT. 311

HONORABLE Carl J. West    JUDGE  R. Rully    DEPUTY CLERK

HONORABLE    JUDGE PRO TEM    ELECTRONIC RECORDING MONITOR

none    Deputy Sheriff none    Reporter

8:30 am BC405843

| | |
|---|---|
| IBEW LOCAL 103 | Plaintiff Counsel |
| VS | |
| INDYMAC MBS INC ET AL | Defendant Counsel |

no appearances

DEEMED COMPLEX 1-29-09

## NATURE OF PROCEEDINGS:

service in the assigned department within seven (7)
days of service.

Any party objecting to the complex designation must
file an objection and proof of service in Department
311 within ten (10) days of service of this minute
order. Any response to the objection must be filed in
Department 311 within seven (7) days of service of
the objection. This Court will make its ruling on the
submitted pleadings.

CLERK'S CERTIFICATE OF MAILING/
NOTICE OF ENTRY OF ORDER

I, the below named Executive Officer/Clerk of the
above-entitled court, do hereby certify that I am not
a party to the cause herein, and that this date I
served Notice of Entry of the above minute order of
1-29-09 upon each party or counsel named below by
depositing in the United States mail at the courthouse
in Los Angeles, California, one copy of the
original entered herein in a separate sealed envelope
for each, addressed as shown below with the postage
thereon fully prepaid.

Date: 1-29-09

John A. Clarke, Executive Officer/Clerk

Page    2 of   3    DEPT. 311

MINUTES ENTERED
01/29/09
COUNTY CLERK

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| DATE: 01/29/09 | | DEPT. 311 |
| HONORABLE Carl J. West | JUDGE R. Rully | DEPUTY CLERK |
| HONORABLE | JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR |
| none | Deputy Sheriff none | Reporter |

| | | |
|---|---|---|
| 8:30 am BC405843 | Plaintiff Counsel | no appearances |
| IBEW LOCAL 103 VS INDYMAC MBS INC ET AL | Defendant Counsel | |
| DEEMED COMPLEX 1-29-09 | | |

**NATURE OF PROCEEDINGS:**

By: _____
        Susan Zuckerman


KREINDLER & KREINDLER LLP
MARK I. LABATON, ESQ.
707 Wilshire Blvd., Suite 4100
Los Angeles, Ca.  90017

Page   3 of 3   DEPT. 311

MINUTES ENTERED
01/29/09
COUNTY CLERK

202



*from the*
### LOS ANGELES SUPERIOR COURT
### *ADR DEPARTMENT*

If you have an unlimited civil case involving one of these subject matter areas:

- commercial
- employment
- medical malpractice
- legal malpractice

- real estate
- trade secrets
- unfair competition
- at judges' discretion

### *Your case may be eligible for the court's Neutral Evaluation (NE) program.*

◆ **NE can reduce litigation time and costs and promote settlement.**

◆ NE is an informal process that offers a non-binding evaluation by an experienced neutral lawyer with expertise in the subject matter of the case. After counsel present their claims and defenses, the neutral evaluates the case based on the law and the evidence.

◆ **NE is voluntary and confidential.**

◆ The benefits of NE include helping to clarify, narrow or eliminate issues, identify areas of agreement, offer case-planning suggestions and, if requested by the parties, assist in settlement.

◆ **The first three (3) hours of the NE session are free of charge.**

For additional NE information, visit the Court's web site at www.lasuperiorcourt.org/adr

REV. 06/27/07

203

**FILED**
LOS ANGELES SUPERIOR COURT

FEB 20 2009

JOHN A. CLARKE, CLERK

BY ELMER SABALBURO, DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| IBEW Local 103 | CASE NO.  BC405843 |
| Plaintiff, | INITIAL STATUS CONFERENCE ORDER |
| v. | (Complex Litigation Program) |
| Indymac MBS, Inc., et al. | |
| Defendant. | |

This case has been assigned for all purposes to Judge Victoria G. Chaney in the Complex Litigation Program.

**An Initial Status Conference is set for 4-13-2009 at 3:00 p.m. in Department 324.** Counsel for all parties are ordered to attend.

Prior to the Initial Status Conference, Counsel for all parties are ordered to meet and confer in person (no later than 10 days before the Conference) and discuss the following areas. Additionally, counsel shall be prepared to discuss these issues with this court at the Initial Status Conference.

1.     Parties and the addition of parties;

INITIAL STATUS CONFERENCE ORDER
-1-

204

1    2.    Claims and defenses;

2    3.    Consideration of any issues of recusal or disqualification;

3    4.    Issues of law that, if considered by the court, may simplify or further resolution of the

4        case;

5    5.    Appropriate alternative dispute resolution (ADR) mechanisms (e.g., mediation,

6        mandatory settlement conference, arbitration, mini-trial, etc.);

7    6.    A plan for preservation of evidence;

8    7.    A plan for disclosure and discovery; which will generally be conducted under court

9        supervision and by court order;

10    8.    Whether it is possible to plan "staged discovery" so that information needed to

11        conduct meaningful ADR is obtained early in the case, allowing the option to

12        complete discovery if the ADR effort is unsuccessful;

13    9.    A target trial date;

14    10.    Whether a structure of representation such as liaison/lead counsel is appropriate for

15        the case in light of multiple plaintiffs and/or multiple defendants;

16    11.    Procedures for the drafting of a Case Management Order, if appropriate;

17    12.    Any issues involving the protection of evidence and confidentiality;

18    13.    The handling of any potential publicity issues;

19    14.    The creation of a single master file for the litigation to eliminate the need for multiple

20        filings of similar documents when related cases have common parties; and

21    15.    Whether it is appropriate to reduce the number of parties upon whom service of

22        documents must be made.

23    16.    The use of a website for electronic service notification and discussion among parties

24        (bulletin/message board services) & online depository.

25    Counsel for plaintiff is to take the lead in preparing a Joint Initial Status Conference Report

26

27

28

INITIAL STATUS CONFERENCE ORDER

-2-

1   to be filed three court days prior to the Initial Status Conference.  The Joint Initial Status Conference

2   Report is to include the following:

3      1.   A list of all parties and counsel;

4      2.   A statement as to whether additional parties are likely to be added and a proposed

5           date by which all parties must be served;

6      3.   An outline of the claims and cross-claims and the parties against whom each claim

7           is asserted;

8      4.   Service lists and procedures for efficient service and filing;

9      5.   The use of a website for electronic service, bulletin/message board services & online

10          depository.  The parties are to be prepared to discuss a potential website provider;

11     6.   Whether any issues of jurisdiction or venue exist that might affect this court's ability

12          to proceed with this case;

13     7.   Applicability and enforceability of arbitration clauses;

14     8.   A list of all related litigation pending in other courts, a brief description of any such

15          litigation, and a statement as to whether any additional related litigation is

16          anticipated;

17     9.   A description of core factual and legal issues;

18     10.  The parties' tentative views on an ADR mechanism and how such mechanism might

19          be integrated into the course of the litigation;

20     11.  Whether discovery should be conducted in phases or limited; and if so, the order of

21          phasing or types of limitations of discovery, and in class actions, whether any phasing

22          or limitation of discovery prior to class certification is appropriate;

23     12.  For class actions, a proposed date for filing the motion for class certification;

24     13.  For insurance coverage cases and construction defect case, an insurance coverage

25          chart listing all insurance, including the names of the insured and insurance company,

26

27

INITIAL STATUS CONFERENCE ORDER

28                               -3-

1    effective dates of the policy, policy limits, amount of monies previously paid out on

2    the policy, whether the policy limits have been exhausted, and whether the policy is

3    primary, umbrella, etc;

4    14.    A proposed discovery cut-off date; and

5    15.    A target date and a time estimate for trial.

6    To the extent the parties are unable to agree on the matters to be addressed in the Joint Initial

7    Status Conference Report, the positions of each party or of various parties shall be set forth

8    separately and attached to this report as an addenda.

9    **To facilitate the orderly conduct of discovery and motions brought before this court,**

10   **all discovery and motion activity are temporarily stayed pending further order of this court.**

11

12   IT IS SO ORDERED.

13

14   Dated:   February 20, 2009

15                                                    Victoria G. Chaney
                                                     Los Angeles Superior Court Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

INITIAL STATUS CONFERENCE ORDER
-4-